336                                    383 Mass. 336

Boston Ass'n of School Adm'rs & Supervisors v. Boston Retirement Board.

BOSTON ASSOCIATION OF SCHOOL ADMINISTRATORS AND
SUPERVISORS[1] & another[2] vs. BOSTON
RETIREMENT BOARD & another.[3]

Suffolk.   January 7, 1981. — April 8, 1981.

Present: HENNESSEY, C.J., KAPLAN, WILKINS, LIACOS, & ABRAMS, JJ.

*Statute*, Construction. *Retirement. Pension. School and School Com-
mittee*, Compensation of personnel, Retirement benefits. *Words*,
"Regular compensation."

For the purpose of calculating retirement benefits due under G. L. c. 32,
§ 5 (2) (*a*), retirement incentive payments were not "regular compen-
sation" within the meaning of c. 32, § 1, as in effect prior to St. 1979,
c. 681.   [339-344]

CIVIL ACTION commenced in the Superior Court Depart-
ment on April 10, 1979.

The case was heard by *Zobel*, J.

After review was sought in the Appeals Court, the Su-
preme Judicial Court ordered direct appellate review on its
own initiative.

*Paul F. Kelly* for Boston Association of School Adminis-
trators and Supervisors.

*John E. Rogerson* for Boston Retirement Board.

*Francis X. Bellotti*, Attorney General, *& E. Michael
Sloman*, Assistant Attorney General, for Commissioner of
Insurance, submitted a brief.

KAPLAN, J.   Boston Association of School Administrators
and Supervisors (BASAS), an unincorporated association,

---

[1] Suing by Hugh McDonagh as its president and representative.

[2] Boston School Committee.  This plaintiff has not appealed from the
judgment against it.

[3] Commissioner of Insurance.

joined as plaintiff by the Boston School Committee, sued the Boston retirement board (see G. L. c. 32, § 20 [4]) and the Commissioner of Insurance, who is charged by statute with supervising the retirement board (see G. L. c. 32, § 21), and prayed a declaration that any early retirement incentive payments agreed to be made by the Boston school committee to BASAS members should be included by the retirement board in the base on which retirement benefits to those persons are calculated. The judge below held against the plaintiffs' contention and entered a declaratory judgment in favor of the defendants. We agree with that disposition.

*The case.* Upon the plaintiff BASAS's motion for summary judgment based on the pleadings, an affidavit of its president, and a statement of agreed facts, the following appeared. Having in view the abolition of various administrative positions in the Boston public school system, the Boston school committee on October 16, 1978, entered into an agreement with BASAS entitled "Abolition of Positions and Reorganization" by which three options were offered to BASAS members who might hold such positions. We need advert only to the first option called "Early Retirement Incentive Program" (ERIP): A member aged fifty-five years or more who in September, 1978, held a position abolished in the reorganization for the 1978-1979 school year, and who had twenty years or more of continuous service in the Boston school system, could make known his purpose to retire with effect from January 2, 1979. In that case he was to receive three payments stated to represent "salary increases" — $4,665 for each of the three school years 1976-1977, 1977-1978, and 1978-1979.

Under date of November 29, 1978, the parties entered into a collective bargaining agreement for the period September 1, 1977, to August 31, 1980, formally approved by the Boston School Committee by order of December 13, 1978, which in article VII set out a different early retirement program: A BASAS member who retired at an age between fifty-five and sixty-five would receive, as a "salary

increase," 20% of his final year's salary or, instead, 10% of each of his two final years' salaries. If a member should receive a payment under the plan but decide not to retire by the "expected date of departure," he would be obligated to return any payment made with legal interest. The Boston school committee undertook to allocate $40,000 to fund this article VII plan during the 1979-1980 school year.[4]

The question naturally arose whether the payments to be made to retirees under ERIP or article VII would fit under the retirement statute as "regular compensation" upon which retirement benefits are required to be calculated. The retirement board made it known that in its opinion they would not so fit. This precipitated the present lawsuit, filed on April 10, 1979.

On November 5, 1979, while the action was pending, the Governor approved an amendatory "clarifying" statute which by added language expressly excluded from the statutory definition of "regular compensation," payments made to participants in a retirement system in consequence of their giving notice of retirement, and referred specifically to early retirement incentives (as well as severance pay for unused sick leave).

The pleadings in the action were extended to include a contention on the part of the plaintiffs that the amendatory statute would be invalid as "retroactive" if applied to persons already employed and participating in the retirement systems — see *Opinion of the Justices*, 364 Mass. 847 (1973), discussing G. L. c. 32, § 25 (5) (quoted at n.8), and constitutional questions — and a retort by the defendants that

---

[4] According to the record, four BASAS members applied for the ERIP option, and fifteen members intended to retire in June, 1980, or June, 1981, under the article VII plan, but none of the nineteen actually went forward and retired. Presumably they hesitated because of the negative position of the Retirement Board about the benefits payable after retirement. However, it is not suggested on either side that the action or appeal should be abandoned as moot, and this would seem undesirable, particularly in view of the tendency of provisions of collective agreements to repeat themselves in substance from period to period. See *Karchmar* v. *Worcester*, 364 Mass. 124, 136 (1973).

the new amendment was merely a clarifying restatement of the effect of the statute as it stood before amendment; the defendants also defended the amendment as a constitutional exercise of the police power even if it were taken as effecting a change of the law.

The upshot of the lawsuit was a judgment entered on July 1, 1980, in substance declaring (with some apparent help from the 1979 statute as a clarifying enactment) that retirement incentive payments under any agreement between the School Committee and BASAS, whatever the payments might be called, were not statutory "regular compensation" on which retirement allowances were to be computed. We brought the case here on our own motion for direct appellate review.

*Discussion.* We need to get two matters out of the way. First, no contention is made here that the school committee undertakes any illegal action in sponsoring or agreeing to such a plan as ERIP or article VII. There is indeed a constitutional doctrine that public funds may not be handed over to private citizens as a gratuity, but no claim is before us that payments promised to be made under any such plan would be illicit as prohibited gifts. This renders not more than tangentially relevant the cases that have dealt with the powers of public employers to add recompense of one kind or other to their employees for past performances, or otherwise to provide rewards where technical "consideration" may have been wanting. See *Averell* v. *Newburyport*, 241 Mass. 333, 335 (1922); *Attorney Gen.* v. *Woburn*, 317 Mass. 465, 467-468 (1945); *Quinlan* v. *Cambridge*, 320 Mass. 124 (1946); *Fitchburg Teachers Ass'n* v. *School Comm. of Fitchburg*, 360 Mass. 105, 107 (1971). The question to be answered here is the quite different one whether given payments to the employees contingent on retirement may form part of the basis for figuring retirement benefits and thereby increase those benefits. Cf. *Selectmen of Brookline* v. *Allen*, 325 Mass. 482 (1950).

Second, it is of no more than incidental interest in solving the question just mentioned what the parties to the agree-

ments might choose to call the payments proposed to be made to the employees, whether "salary increases" or "bonuses" or something else. For the system of retirement benefits covering the employees is described in a chapter of the General Laws which contains its own terms and definitions of terms.

Therefore we turn to the statutory provisions. General Laws c. 32, § 5 (2) (a), is in part as follows:

"(2) *Amount of Allowance.* Upon retirement under the provisions of this section a member shall receive a superannuation retirement allowance to become effective on the date of his retirement. . . .

(a) The normal yearly amount of the retirement allowance . . . shall, subject to the limitations set forth in this section, be based on the average annual rate of regular compensation received by such member during any period of three consecutive years of creditable service for which such rate of compensation was the highest, or on the average annual rate of regular compensation received by such member during the period or periods, whether consecutive or not, constituting his last three years of creditable service preceding retirement, whichever is the greater, and shall be computed according to the following table based on the age of such member and his number of years and full months of creditable service at the time of his retirement. . . ."[5]

"Regular compensation" was defined as follows by c. 32, § 1 (prior to its amendment by the 1979 legislation):

"'Regular compensation' . . . shall mean the salary, wages or other compensation in whatever form, lawfully determined for the individual service of the

---

[5] We omit much detail such as provisions that set out the maximum benefits payable.

For a condensed description of the retirement systems, see *Opinion of the Justices,* 364 Mass. 847, 852-856 (1973).

employee by the employing authority, not including bonus or overtime . . . ."

The quoted statutory provisions do not wear their meaning on their sleeve, but it emerges on fair analysis. The yearly amount of a retirement allowance is by § 5 (2) (*a*) to be based on the "average" rate of "regular compensation" over the three years. The expression seems to us to point to recurrent or repeated amounts of compensation not inflated by extraordinary ad hoc payments. This view is confirmed when we go to the definition of "regular compensation" in § 1. In the words "salary, wages or other compensation in whatever form" the last generic phrase takes its color of meaning from "salary" and "wages" (noscitur a sociis; see *Elwood* v. *State Tax Comm'n,* 369 Mass. 193, 195-196 [1975]), and the whole refers to remuneration geared to work or services performed; moreover "regular," as it modifies "compensation," imports the idea of ordinariness or normality as well as the idea of recurrence. All this contrasts with "overtime" and with the compendious "bonus" which are to be excluded from the compensation that figures in computing retirement benefits. Taking § 5 (2) (*a*) together with § 1 we find a safeguard against the introduction into the computations of adventitious payments to employees which could place untoward, massive, continuing burdens on the retirement systems. (The safeguard is needed especially where the public entity that negotiates a collective agreement is not the one that will have to find the funds to pay the continuing retirement benefits above the avails of employee contributions.)

ERIP and the article VII plan are illustrative of such adventitious or extrinsic payments that do not, and in reason should not, find their way into the retirement calculations to swell the benefits that may be payable over long periods of time. In a general sense, it is true, severance payments may be thought of as rewards for past performance, but here there is no natural or reasonable relationship between the payments of fixed amounts (as in ERIP) or the percent-

age payments (as in article VII) and the particular performances given in the years to which the payments are nominally attributed: it needs no suspicious turn of mind to infer that the attribution to the last years of employment is with a purpose to influence the amount of the benefits owing after retirement. The payments are, in truth, not salary increases for those years, e.g., increases across the board to employees in given job classifications which do properly figure in retirement calculations (see *Selectmen of Brookline v. Allen, supra* at 484-485), but money held out simply to induce early retirement.[6] The payments promised are not "regular compensation" but have the character of premiums to particular individuals, beyond such compensation, which conform to the idea of a "bonus" in the common understanding of that term.

Thus, while recognizing fully the "beneficent purposes" of the retirement statutes (*Selectmen of Brookline v. Allen, supra* at 486), we reach a decision for the defendants by interpretation of the statutes as they stood before the 1979 statute, and without reliance on that statute.[7] Our conclusion, however, is consistent with it. Statute 1979, c. 681, approved November 5, 1979, and effective on February 3, 1980, is entitled, "An Act clarifying the definition of regular compensation," and in material part states: "'Regular compensation' . . . shall mean the salary, wages or other compensation in whatever form, lawfully determined for the individual service of the employee by the employing authority, not including bonus, overtime, severance pay for any and all unused sick leave, early retirement incentives, or any other payments made as a result of giving notice of retirement . . . ." The fact that we need not and do not

---

[6] This finds nice confirmation in the provision of article VII that the incentive payments are to be returned with interest if retirement does not in fact take place.

[7] If the statute were thought more than merely clarifying, and invalid so far as "retroactive," as the plaintiffs claimed, it would still affect the treatment of new employees coming into the systems.

383 Mass. 336                                                343

Boston Ass'n of School Adm'rs & Supervisors v. Boston Retirement Board.

rely on the "clarifying" statute relieves us of any duty to face the question when a given enactment may fairly be used to aid in the interpretation of a prior enactment. The answer has often been made to depend on circumstances. See *Elwood* v. *State Tax Comm'n, supra* at 198-199; *Fitz-Inn Auto Parks, Inc.* v. *Commissioner of Indus.*, 350 Mass. 39, 42 (1965); *Packard Clothes, Inc.* v. *Director of the Div. of Employment Security*, 318 Mass. 329 (1945). Cf. *Massachusetts Comm'n Against Discrimination* v. *Liberty Mut. Ins. Co.*, 371 Mass. 186, 193-194 (1976). See generally 2A C. Sands, Sutherland Statutory Construction § 49.11 (4th ed. 1973).

If the meaning of the statutes prior to amendment were less clear, administrative practice might play a proper part in interpretation, and that practice, if firm enough and sufficiently sustained in favor of employees in the retirement system at the time, could raise in them those reasonable expectations for which they could possibly claim protection under G. L. c. 32, § 25 (5),[8] or even the Constitution, all as explained in *Opinion of the Justices*, 364 Mass. 847, 861-862 (1973). In this case, however, the defendant retirement board did not acquiesce in the position that the retirement benefits could be increased legally under the statutes by a plan on the style of ERIP or article VII, no retirement benefits were in fact paid on that basis, and no expectations of such benefits could have been fairly or reasonably generated.[9]

---

[8] Section 25 (5) states: "The provisions of sections one to twenty-eight, inclusive, and of corresponding provisions of earlier laws shall be deemed to establish and to have established membership in the retirement system as a contractual relationship under which members who are or may be retired for superannuation are entitled to contractual rights and benefits, and no amendments or alterations shall be made that will deprive any such member or any group of such members of their pension rights or benefits provided for thereunder, if such member or members have paid the stipulated contributions specified in said sections or corresponding provisions of earlier laws."

[9] The nonacquiescence of the retirement board was expressed in letters of its chairman of June 27, 1978, and November 15, 1978, respectively to

On the matter of using retirement incentive pay, pay-
ment for accumulated unused sick leave, and the like as part
of the base for figuring retirement allowances, the decisions
in other States are naturally dependent on the specific terms
of statutes embodying particular retirement systems. But
we find support for our interpretation and conclusion here
in the cases noted in the margin.[10]

*Judgment affirmed.*

---

the associate superintendent of the Boston school department and the
president of the Boston school committee. There were opinions looking
the other way, notably an opinion of the Attorney General dated Novem-
ber 29, 1977 (Rep. A.G., Pub. Doc. No. 12, at 97 [1977]), dealing with
unused sick leave. As indicated in *Massachusetts Teachers Ass'n* v.
*Teachers' Retirement Bd.,* a companion case, *post* 345 (1981), the At-
torney General appears now to recede from that opinion.

[10] See *Stover* v. *Retirement Bd.,* 78 Mich. App. 409, 413 (1977);
*Michigan State Police Command Officers' Ass'n* v. *Department of Pub.
Safety,* 80 Mich. App. 278, 280 (1977); *Lansing Fire Fighters Ass'n Local
421* v. *Trustees of Lansing Policemen's & Firemen's Retirement Sys.,* 90
Mich. App. 441, 444-445 (1979). But cf. *Anderson* v. *Pension & Retire-
ment Bd. of Milford,* 167 Conn. 352, 356 (1974). For the significance of
administrative practice in creating or discouraging the "vesting" of expec-
tations as "contractual relationships" under a constitutional provision, see
*In re Bookhout,* 54 App. Div. 2d 477, 478-479 (1976), rev'd in part, 43
N.Y.2d 612 (1978) (summarizing a line of New York cases). Cf. *Washing-
ton Ass'n of County Officials* v. *Washington Pub. Employees' Retirement
Sys. Bd.,* 89 Wash. 2d 729, 733 (1978).