EDWARD OLSEN & another[1] *vs.* TEACHERS' RETIREMENT BOARD.

No. 06-P-1619.

Suffolk. May 16, 2007. - October 9, 2007.

Present: TRAINOR, DREBEN, & KATZMANN, JJ.

*School and School Committee,* Compensation of personnel, Collective bargaining. *Contributory Retirement Appeal Board. Words,* "Regular compensation."

Stipends paid to certain teachers in accordance with a collective bargaining agreement between the school committee and the teachers' bargaining representative qualified as "regular compensation," as defined by G. L. c. 32, § 1, for purposes of calculating the teachers' retirement allowances, where the stipends were recurring payments that were made in order to retain teachers who were losing certain benefits. [431-435]

CIVIL ACTION commenced in the Superior Court Department on March 4, 2005.

The case was heard by *Christopher J. Muse,* J., on a motion for judgment on the pleadings.

*Judy Zeprun Kalman* for the defendant.

*Colin R. Confoey* for the plaintiffs.

DREBEN, J. The question before us is whether "stipends" paid to the plaintiffs in accordance with a collective bargaining agreement between the Brockton school committee (school committee) and Brockton Education Association (BEA) qualify as "regular compensation" as defined by G. L. c. 32, § 1, for purposes of calculating the plaintiffs' retirement allowances.[2] After the Teachers' Retirement Board (board) and the Contribu-

---

[1]Robert Tilley.

[2]The basic formula for computing a member's retirement amount is set forth in G. L. c. 32, § 5(2)(*a*). One component is the average annual rate of "regular compensation" over a three-year period. See *Bulger* v. *Contributory Retirement Appeal Bd.,* 447 Mass. 651, 654 (2006).

tory Retirement Appeal Board (CRAB)[3] determined that they did not so qualify, the plaintiffs sought judicial review of CRAB's decision pursuant to G. L. c. 30A, § 14. A judge of the Superior Court, concluding that CRAB was in error and that the payments were regular compensation, granted the plaintiffs judgment on the pleadings. This is an appeal by the board.[4] We affirm the judgment.

The facts are not in dispute.[5] During collective bargaining negotiations for the period September 1, 2002 to August 31, 2005 between the school committee and BEA, the teachers' exclusive bargaining representative,[6] the school committee proposed to increase the employee health insurance premium contribution rate from twenty percent to twenty-five percent of the cost of the total annual premium. After lengthy negotiations, the parties agreed, in a memorandum of agreement subsequently incorporated into the collective bargaining agreement, that teachers would contribute twenty-five percent of the premiums of the city-offered plan they had chosen and that active teachers who had been enrolled in a city-offered plan in 2002-2003 would receive stipends, effective July 1, 2003, "to be paid as part of their regular salary." As explained in a parenthetical note, the stipends "will be the dollar amounts that correspond to five percent of the total annual premiums" for the city-offered health insurance plan in which the teacher had been enrolled in 2002-2003.[7] To be eligible, teachers had to be employed in 2002-2003 and had to have been enrolled in a city-offered health insurance plan in 2002-2003. The collective bargaining agreement provided:

---

[3]CRAB referred the matter to the division of administrative law appeals (DALA); the administrative magistrate affirmed the decision of the Teachers' Retirement Board, and CRAB affirmed the DALA decision.

[4]CRAB did not file a notice of appeal.

[5]The facts and exhibits were stipulated and the matter was submitted to DALA without a hearing.

[6]The BEA also represents all professional employees of the school department with certain exceptions. We will follow the procedure set forth in art. IA of the collective bargaining agreement that "[u]nless otherwise indicated, the employees . . . will be hereinafter referred to as 'teachers'. . . ."

[7]The stipends were to be prorated if in the first year of implementation the twenty-five percent employee contribution was in effect for only a portion of the year.

"Beginning on July 1, 2004, the listed stipends will be increased by the amount of the general salary increase in that year and in future years. Eligible teachers who change plans, change level of coverage, or drop off of health insurance entirely after June 30, 2003 will continue to receive the stipend that corresponds to the plan and level of coverage that they had during 2002-2003. Eligible teachers who return from an approved leave of absence or who are recalled after a layoff will remain eligible for the stipend. Eligible teachers who resign and who later are rehired, however, will no longer be eligible for the stipend."

Thus, for the first year, the stipend was to be in an amount equal to the premiums paid, but thereafter the stipend was not tied to the cost of health insurance. In all subsequent years the stipend was to increase at the rate of the general salary increase of that year and to continue whether or not the teacher remained in a city-offered plan. One thousand fifty-nine of the BEA's approximately 1,400 members received the stipend.

In reviewing CRAB's decision, while we must give " 'due weight to the experience, technical competence, and specialized knowledge of the agency, as well as to the discretionary authority conferred upon it' . . . [w]e exercise de novo review of legal questions, . . . and we must overturn agency decisions that are not consistent with governing law." *Bulger* v. *Contributory Retirement Appeal Bd.*, 447 Mass. 651, 657 (2006) (citations omitted). As in that case the only dispute revolves around the term "regular compensation."

In relevant part, G. L. c. 32, § 1, as appearing in St. 1979, c. 681, defines "regular compensation" as follows:

" 'Regular compensation' . . . shall mean the salary, wages or other compensation in whatever form, lawfully determined for the individual service of the employee by the employing authority, not including bonus, overtime, severance pay for any and all unused sick leave, early retirement incentives, or any other payments made as a result of giving notice of retirement, . . . provided, that . . . salary, wages or other compensation payable in the form of cost of living bonuses and cost of living pay adjustments shall be included in such term."

In arguing for their respective interpretations of "regular compensation" — the board to exclude the stipend, and the plaintiffs to include it — both rely on *Boston Assn. of Sch. Administrators & Supervisors* v. *Boston Retirement Bd.*, 383 Mass. 336 (1981). We turn to that case, which we will refer to as the *BASAS* case. After the Boston school committee intended to abolish certain administrative positions, it entered a collective bargaining agreement with the Boston Association of School Administrators and Supervisors (BASAS). Under the agreement a BASAS member who retired between ages fifty-five and sixty-five would receive as a "salary increase" either twenty percent of his final year's salary or ten percent of each of his last two years' salary. If a member received a payment but did not retire, he would be required to return the payment plus interest. *Id.* at 337-338. At issue was whether these payments to employees which were contingent on retirement were "regular compensation" for purposes of retirement benefits. *Id.* at 339.

In construing the statute (prior to its 1979 amendment), the *BASAS* court stated:

> "The yearly amount of a retirement allowance is by [G. L. c. 32,] § 5(2)(*a*) to be based on the 'average' rate of 'regular compensation' over the three years. The expression seems to us to point to recurrent or repeated amounts of compensation not inflated by extraordinary ad hoc payments. This view is confirmed when we go to the definition of 'regular compensation' in § 1. In the words 'salary, wages or other compensation in whatever form' the last generic phrase takes its color of meaning from 'salary' and 'wages,' . . . and the whole refers to remuneration geared to work or services performed; moreover 'regular,' as it modifies 'compensation,' imports the idea of ordinariness or normality as well as the idea of recurrence. All this contrasts with 'overtime' and with the compendious 'bonus' which are to be excluded from the compensation that figures in computing retirement benefits. Taking § 5(2)(*a*) together with § 1 we find a safeguard against the introduction into the computations of adventitious payments to employees which could place untoward, massive, continuing burdens on the retirement systems. (The safeguard is needed especially where the public entity that negotiates a collective agree-

ment is not the one that will have to find the funds to pay the continuing retirement benefits above the avails of employee contributions.) . . .

"The payments are, in truth, not salary increases for those years, e.g., increases across the board to employees in given job classifications which do properly figure in retirement calculations, but money held out simply to induce early retirement. The payments promised are not 'regular compensation' but have the character of premiums to particular individuals, beyond such compensation, which conform to the idea of a 'bonus' in the common understanding of that term."

*Id.* at 341-342 (citations omitted).

The board lays stress on the language of remuneration geared to "work or services performed" and argues that the stipend here is not for such work or services but is a bonus for particular employees. Eligibility for the stipend is not dependent on services provided by a teacher but rather on whether he or she was an active teacher enrolled in a city-offered health plan during the 2002-2003 school year. The plaintiffs, on the other hand, emphasize that the stipend is a recurrent or repeated amount of compensation and, after the first year, is not geared to the cost of health care or a teacher's continued participation in a city-offered health plan. Moreover, unlike the agreement in *BASAS*, the stipend was not a bonus to induce early retirement, but rather an annual increase in salary dependent on the amount of the general salary increase for such year.

Subsequent to the *BASAS* case, and also subsequent to the trial court's opinion, the Supreme Judicial Court decided another case relevant to our discussion: *Bulger* v. *Contributory Retirement Appeal Bd.*, 447 Mass. 651 (2006). One of the issues in that case was whether a housing allowance paid to the president of the University of Massachusetts was "regular compensation." In view of the interpretation in *BASAS*, the *Bulger* court, *supra* at 658, considered the statutory language "straightforward and unambiguous."[8] Referring to *BASAS* and to *Bower* v. *Contributory Retirement Appeal Bd.*, 393 Mass. 427, 429 (1984), the court stated:

---

[8] In the *BASAS* case, Justice Kaplan had said, "The . . . statutory provisions

"We have recognized that the expression 'regular compensation' 'point[s] to recurrent or repeated amounts of compensation not inflated by extraordinary ad hoc payments. . . . [M]oreover "regular," as it modifies "compensation," imports the idea of ordinariness or normality as well as the idea of recurrence.' The use of the terms 'salary, wages or other compensation in whatever form,' denotes, unquestionably in our minds, a legislative intent to include the many distinct ways in which individuals are paid for their services. As wages have a meaning apart from salary, so *'other compensation in whatever form' must be understood to encompass all other forms of recurring payments for an employee's services, so long as the payments comport with the other requirements of [G. L. c. 32,] § 1"* (emphasis supplied).

*Bulger* v. *Contributory Retirement Appeal Bd.,* 447 Mass. at 658 (citations omitted). The court then held that the housing allowances were "recurrent," "regular," and "ordinary" remuneration for Bulger's services and rejected CRAB's characterization of the payments as designed to reimburse Bulger for the additional expenses associated with maintaining a residence.

Here, the trial judge was correct in determining the stipend to be "regular compensation," falling within "other compensation in whatever form," a term that the *Bulger* court stated "must be understood to encompass all other forms of recurring payments for an employee's services, so long as the payments comport with the other requirements of [G. L. c. 32,] § 1." *Ibid.* The judge pointed out that "negotiating parties need not match every salary increase with a particular service rendered to the employer in order for that salary increase to constitute 'regular compensation.' " An annual salary increase may be bargained for in exchange for the continued comprehensive services rendered by BEA members to the school committee. The trial court's analysis, rendered before the *Bulger* opinion, was also implicitly approved in that case, when the court noted that the trustees "considered Bulger's acceptance of a housing allowance as an important enhancement of his compensation package

do not wear their meaning on their sleeve, but it emerges on fair analysis." *Id.* at 341.

that would motivate his interest in the presidency for an additional five-year term." *Id.* at 659. Similarly, here, the school committee could well have thought that in order to retain teachers who were losing certain benefits, the committee had to provide a more generous compensation package.[9] While the benefits lost may not have been "regular compensation,[10] the compensation package provided was.

*Judgment affirmed.*

---

[9]That the agreement called the stipend part of "regular compensation" is not determinative and has been said to be only of "incidental interest." See *BASAS*, 383 Mass. at 339-340.

[10]Cf. G. L. c. 32B, § 7A(*a*), inserted by St. 1968, c. 100, § 1, a statute providing for health insurance benefits for active and qualified retired public employees of counties, cities, towns, and districts, which provides that an employer shall withhold from "each payment of salary, wages, other compensation, pension or retirement allowance," "fifty percent of a premium for the insurance of the employee," and "the governmental unit shall contribute the remaining fifty percent . . . ." Implicit in the foregoing language is that the employer's share of premiums is not "other compensation" under c. 32B, § 7A.