## Marie J. Parente vs. State Board of Retirement & another.[1]

No. 10-P-2114.

Worcester. September 7, 2011. - November 3, 2011.

Present: Berry, Meade, & Milkey, JJ.

*Public Employment,* Retirement benefits. *Contributory Retirement Appeal Board. Retirement. Pension. General Court. Statute,* Construction. *Words,* "Regular compensation."

An annual allowance for expenses [749-755] and a travel per diem allowance [755-756] that were paid to the plaintiff, pursuant to G. L. c. 3, § 9B, while she was a member of the General Court, were not "regular compensation" as that term is defined by G. L. c. 32, § 1, for purposes of calculating the plaintiff's retirement benefits, where both allowances were provided for General Court members' expenses, rather than as additional compensation or wages.

The fair market value of a parking space that was provided to the plaintiff, a retired member of the General Court, for use while she worked at the State house, could not be considered "regular compensation" as that term is defined by G. L. c. 32, § 1, for purposes of calculating the plaintiff's retirement benefits. [756]

Civil action commenced in the Superior Court Department on November 16, 2009.

The case was heard by *James R. Lemire,* J., on a motion for judgment on the pleadings.

*Charles J. Brucato, Jr.,* for the plaintiff.

*Melinda E. Troy* for the defendants.

Meade, J. Marie J. Parente appeals from a Superior Court judgment that upheld the decision of the Contributory Retirement Appeal Board (CRAB) that (1) her annual allowance for expenses, (2) her travel per diem allowance, and (3) the taxable value of her State house parking space were properly excluded

[1]Contributory Retirement Appeal Board.

from her retirement calculations and do not constitute "regular compensation" under G. L. c. 32, § 1. We affirm.

1. *Background.* The facts are not in dispute. Parente was a member of the Massachusetts General Court, serving as a Massachusetts State representative from February, 1981, through December, 2006. During her service, she was a member of the Massachusetts State employees' retirement system. Parente retired on January 7, 2007. In November, 2006, she applied for her pension benefits with the State retirement board (board). In a letter dated December 4, 2006, Parente requested that her "travel income" be considered "regular compensation" under G. L. c. 32, § 1, and therefore included in her calculation for retirement benefits. Parente's "travel income" included (1) an annual allowance for expenses pursuant to G. L. c. 3, § 9B (annual allowance); (2) a travel per diem allowance pursuant to G. L. c. 3, § 9B (travel per diem allowance); and (3) the taxable value of the parking space provided to her through the bureau of state office buildings. On February 22, 2007, the board met and voted to deny Parente's request to include the above as regular compensation for retirement purposes. Parente timely appealed the board's decision to CRAB, and CRAB referred the matter to the division of administrative law appeals (DALA) for a hearing. On June 27, 2008, DALA affirmed the board's decision, and on November 3, 2009, CRAB issued a decision adopting DALA's conclusion and affirming the board's decision. Challenging CRAB's decision, Parente filed an action in Superior Court pursuant to G. L. c. 30A, § 14. After a hearing, the judge denied Parente's motion for judgment on the pleadings, and affirmed CRAB's decision.

On appeal, Parente raises three claims: (1) the judge erred in deferring to CRAB's interpretation of "regular compensation"; (2) "regular compensation" should include Parente's annual allowance, her travel per diem allowance, and the fair market value of the parking space she was provided; and (3) the judge's reliance on certain case law and 840 Code Mass. Regs. § 15.03 (2006) was misplaced.

2. *G. L. c. 3, § 9B.* In addition to an annual salary, each member of the General Court receives a $7,200 annual allowance for expenses pursuant to G. L. c. 3, § 9B, which is entitled

"Member's allowances for expenses, travel, meals and lodging." The statute states that "each member shall be entitled to receive $600 on the first day of each session and the first day of each month thereafter until said sum of $7,200 shall have been paid." G. L. c. 3, § 9B, as appearing in St. 2000, c. 159, § 10.

Section 9B also states that, depending on where a General Court member resides, each member shall be paid a per diem allowance for "mileage, meals and lodging." *Id.*, as appearing in St. 1979, c. 686, § 2. The amount of the travel per diem allowance, which is paid in addition to the $7,200 annual allowance, is based on how many miles the member must travel to Boston. For example, a State representative living in the town of Belmont may receive a travel per diem allowance of $10 per day, while someone living in Milford (where Parente resided during the period in question) may receive an allowance of $26 per day. A General Court member is eligible for this allowance regardless of whether the General Court is in session, as long as it is "in the performance of his official duties" and "upon certification to the state treasurer that he was present at the state house." G. L. c. 3, § 9B, inserted by St. 1979, c. 686, § 2. Unlike the $7,200 annual allowance, the travel per diem allowance is not automatically received by a member. In order to receive this allowance, a State member must complete a "Per Diem Request Form" and attest, under pains and penalties of perjury, that the request is in compliance with G. L. c. 3, § 9B.

Each State representative is also provided a space in which to park while they are working in the State house. Parente was given such a space. Her parking space was given an estimated annual fair market value of $1,560.

3. *Discussion.* Parente claims that the definition of "regular compensation" pursuant to G. L. c. 32, § 1, is broad enough to encompass the annual allowance, the travel per diem allowance, and the taxable value of her parking space at the State house. The board, DALA, CRAB, and the judge concluded that it is not. Pursuant to G. L. c. 30A, § 14, as appearing in St. 1973, c. 1114, § 3, we are required to give "due weight to the experience, technical competence, and specialized knowledge of the agency [CRAB], as well as to the discretionary authority conferred upon it." We "will reverse only if [CRAB's] decision

was based on an erroneous interpretation of law or is unsupported by substantial evidence." *State Bd. of Retirement* v. *Contributory Retirement Appeal Bd.*, 77 Mass. App. Ct. 452, 455 (2010), citing *Foresta* v. *Contributory Retirement Appeal Bd.*, 453 Mass. 669, 676 (2009). Parente argues that the judge erred in giving deference to CRAB's statutory interpretation, because that interpretation was incorrect. We disagree.

"Where an agency's interpretation of a statute is reasonable, the court should not supplant it with its own judgment." *Boston Retirement Bd.* v. *Contributory Retirement Appeal Bd.*, 441 Mass. 78, 82 (2004). Upon review, there is nothing in the record or case law to indicate that CRAB's interpretation of "regular compensation" is unreasonable. For the reasons discussed in the sections below, the judge properly gave deference, not abdication as Parente suggests, to CRAB's statutory interpretation.

a. *"Regular compensation."* Section 1 of G. L. c. 32, as appearing in St. 1979, c. 681, defines, in relevant part, "regular compensation," for any period subsequent to December 31, 1945,[2] as "the salary, wages or other compensation in whatever form, lawfully determined *for the individual service of the employee by the employing authority,* not including bonus, overtime, severance pay for any and all unused sick leave, early retirement incentives, or any other payments made as a result of giving notice of retirement" (emphasis supplied). By regulation, the public employee retirement administration commission, which promulgated regulations regarding the State retirement system, has further defined "regular compensation" as a payment that must "be made as remuneration for services actually rendered." 840 Code Mass. Regs. § 15.03(1)(a)(2) (2006).

(i) *$7,200 annual allowance under G. L. c. 3, § 9B.* Section 9B of G. L. c. 3 permits each member of the General Court to receive $7,200 annually for "expenses." Parente claims that in light of the Supreme Judicial Court's decision in *Bulger* v. *Contributory Retirement Appeal Bd.*, 447 Mass. 651 (2006), this

---

[2]In June, 2009, the definition of "regular compensation" was amended. See St. 2009, c. 21, § 2. The new definition, which became effective July 1, 2009, but not applicable here, states that regular compensation "shall be compensation received exclusively as wages by an employee for services performed in the course of employment for his employer." G. L. c. 32, § 1, inserted by St. 2009, c. 21, § 2.

annual allowance must be considered part of her "regular compensation" pursuant to G. L. c. 32, § 1, and therefore must be included in her retirement calculation. We disagree.

In *Bulger*, the plaintiff was a university president who received a monthly housing allowance as part of his compensation package.[3] *Id.* at 651-652. "Bulger received his housing allowance as part of his regular paycheck." *Id.* at 653. The Supreme Judicial Court rejected CRAB's refusal to include that monthly allowance in Bulger's retirement calculations. *Id.* at 658-660. In so holding, the court found it compelling that the payments were "recurrent," "regular," and "ordinary." *Id.* at 658. Parente focuses her argument on these factors, but our analysis is not so confined. In *Bulger*, the court also found compelling that the university's board of trustees, and Bulger himself, knew that these monthly allowances were not being used, nor were they really intended to be used, for housing expenses. *Id.* at 658-659. In fact, the trustees knew Bulger would continue to reside at his house in the South Boston section of Boston, and "felt at that time that Bulger had done an outstanding job as university president and considered Bulger's acceptance of a housing allowance as an important enhancement of his compensation package that would motivate his interest in the presidency for an additional five-year term." *Id.* at 658-659.

Parente argues that the $7,200 annual allowance, split into monthly payments, makes this allowance "recurrent," "regular," and "ordinary" and therefore makes it "regular compensation." Although we do not disagree that the annual allowance may be recurrent, regular, and ordinary, these reasons alone do not require us to deem it "regular compensation" under G. L. c. 32, § 1. While the fact that a payment is recurrent, regular, and ordinary is important in determining whether it qualifies as regular compensation, the analysis does not end there. The payment in question not only must meet these requirements, but also must "comport with the other requirements of § 1." *Id.* at 658. Even though § 1 does state "other compensation in whatever form," the statute further qualifies that the compensation

---

[3]In addition, Bulger argued unsuccessfully that monthly payments made by the university to an annuity fund in his name also qualified as "regular compensation," but that argument has little impact with regard to Parente's case.

must be for "individual *service* of the employee by the employing authority" (emphasis supplied). In fact, G. L. c. 3, § 9B, as appearing in St. 2000, c. 159, § 10, specifically states that "[e]ach member of the general court shall receive $7,200 annually for *expenses* to be paid as follows" (emphasis supplied).[4]

Parente claims that the annual allowance is not required to be used for the stated reasons, i.e., expenses. In order to be considered regular compensation, however, the annual allowance would need to have been given in exchange for the service Parente provided during her time as a State representative. While Parente was not required to turn in receipts or proof of expenses to receive the annual allowance, this does not mean there was no requirement that the allowance be used for the stated reasons. The annual allowance was implemented because of the recognition that General Court members often have more expenses than those in private industry (due to the fact they often live outside the city of Boston). The annual allowance was developed so that members did not have to pay for those expenses out of their salary. Simply because Parente did not have to prove that she had any expenses in order to receive the annual allowance does not then mean it was intended to be additional compensation for her services. As CRAB reasonably concluded, this simply could mean that the members of the General Court were placed on an "honor system" when it came to this annual allowance. Here, unlike in *Bulger*, there is nothing in the record that indicates the § 9B allowance was not intended to be used for expenses.

Unlike the *Bulger* housing allowance, we conclude that the annual allowance is more closely analogous to the personal use of a city-provided automobile as in *Pelonzi* v. *Retirement Bd. of Beverly*, 451 Mass. 475 (2008), and the "uniform allowance" given to State correction officers in *O'Brien* v. *Contributory Retirement Appeal Bd.*, 76 Mass. App. Ct. 901 (2010). In *Pelonzi*,

---

[4]In 1953, the special commission established to perform an investigation and study relative to travel and expense allowances for members of the General Court submitted a report recognizing that members of the General Court "are subjected to expenses above and beyond the demands made upon the man in private industry, which must come out of their salary. To meet these additional demands and assure the public that its interests are properly represented [the commission] . . . recommended an annual payment of four hundred dollars." House Bill No. 2491 (filed Mar. 31, 1953).

Beverly's former commissioner of public safety requested the value of his personal use from a city-provided automobile be included as regular compensation pursuant to G. L. c. 32, § 1. *Pelonzi, supra* at 476. Pelonzi's "employment agreement with the city expressly required that he be 'on-call' for emergency response at all times . . . [and] it appears that the city contemplated the automobile as a tool, or piece of equipment, that would enable [Pelonzi] to perform his job more effectively. Although the characterization in an employment agreement does not determine, as matter of law, whether a job benefit falls within the scope of 'regular compensation,' the language of a particular employment agreement may be relevant . . . to demonstrate mutual expectations of an employer and employee." *Id.* at 480 (citation omitted).

On appeal, Pelonzi, like Parente does here, likened his circumstances to those in *Bulger*, in support of an expanded definition of "regular compensation." To this, the Supreme Judicial Court reiterated that "the housing allowance payments [in *Bulger*] were never intended to be used for housing," whereas the employment agreement between the city and Pelonzi seemed to indicate that the automobile was provided so that Pelonzi could be on call for work at all times. *Ibid.*

While there is no employment agreement in this case, we do have a statute that clearly states each member shall receive $7,200 annually for "expenses." "If a sensible construction is available, we shall not construe a statute to make a nullity of pertinent provisions or to produce absurd results." *Flemings* v. *Contributory Retirement Appeal Bd.*, 431 Mass. 374, 375-376 (2000). To conclude that the Legislature intended the $7,200 annual allowance to be for anything other than what it states (i.e., expenses) would be to ignore the plain and unambiguous language of G. L. c. 3, § 9B. "As always, we interpret the statutory language 'according to the intent of the Legislature ascertained from all its words construed by the ordinary and approved usage of the language, considered in connection with the cause of its enactment, the mischief or imperfection to be remedied and the main object to be accomplished, to the end that the purpose of its framers may be effectuated.' " *Boston Police Patrolmen's Assoc., Inc.* v. *Boston*, 435 Mass. 718, 719-720 (2002), quoting from *O'Brien* v. *Director of the Div. of*

*Employment Sec.,* 393 Mass. 482, 487-488 (1984). Here, it is plain that the Legislature intended the $7,200 to be for General Court members' expenses, not additional compensation or wages, even in the broad category of "regular compensation."

In *O'Brien* v. *Contributory Retirement Appeal Bd.,* we determined that a correction officer's annual "uniform allowance" did not constitute "regular compensation" for purposes of determining retirement calculations. *O'Brien, supra* at 903, citing *Pelonzi, supra* at 480. We held that "[a] uniform allowance is not a form of payment, or 'other compensation,' for the services rendered by the employee; rather, it is a benefit offered by the public employer as a matter of convenience so that its employees will be attired in standard and identifiable clothing on the job . . . . The uniform is a 'tool' required to be used by the employees in [that public employer's] office." *O'Brien, supra* at 903. See 840 Code Mass. Regs. § 15.03(1)(a)(2). The uniform allowance, therefore, was not intended to compensate O'Brien for his "service" but was given to him to use "in connection with his official duties and job title." *Ibid.*[5]

In similar fashion, Parente, as a State representative, was not given the $7,200 allowance in exchange for her service in the General Court, but it was provided to assist her in serving the Commonwealth by providing a means to pay for the expenses associated with working as a representative. General Court

---

[5]Parente's reliance on *Christensen* v. *Contributory Retirement Appeal Bd.,* 42 Mass. App. Ct. 544 (1997), is misplaced. There, the plaintiffs negotiated agreements for annual "longevity" payments that were to be included in their "regular compensation." *Id.* at 547-548. Here, however, as detailed above, the annual allowance was not for services rendered. Parente also incorrectly finds support in *Olsen* v. *Teachers' Retirement Bd.,* 70 Mass. App. Ct. 429 (2007), where a stipend paid to a group of teachers was treated as "regular compensation" as part of a collective bargaining agreement. *Id.* at 430. After the first year, the stipend was to "increase at the rate of the general salary increase of that year and to continue whether or not the teacher remained in a city-offered [health] plan." *Id.* at 431. Here, however, the $7,200 annual allowance, the per diem travel allowance, and the value of the parking space are not similar to the bargained-for stipend increase in *Olsen.* As we held in *Olsen,* the stipend could be compared to the housing allowance in *Bulger,* because "the school committee could well have thought that in order to retain teachers who were losing certain benefits, the committee had to provide a more generous compensation package." *Olsen, supra* at 435. In the circumstances presented here, the allowances were simply not given to State representatives to provide them greater compensation or to prevent them from leaving their positions.

members are required to attend sessions in Boston, just as correction officers are required to wear a standard uniform.

(ii) *Per diem payments.* In addition to the $7,200 annual allowance, G. L. c. 3, § 9B, provides for a per diem allowance to each member of the General Court for "mileage, meals and lodging." Unlike the annual allowance of $7,200, which is uniformly given to all members, the travel per diem allowance is based on where a member resides. Members must fill out a form and sign, under penalties of perjury, that they were at the State house on the day of the requested allowance. For many of the same reasons stated above, this travel per diem allowance is also not "regular compensation" because it is not "for the individual service of the employee by the employing authority." G. L. c. 32, § 1. Nor does *Bulger* transform the travel per diem allowances into regular compensation.

Section § 9B states that "a member of the general court who lives in the city or town of . . . Milford . . . shall receive a per diem allowance for mileage, meals and lodging of $26 per day." G. L. c. 32, § 9B, as amended through St. 2000, c. 159, § 10. To be considered "regular compensation," the payments must be for the "individual service" of a member. G. L. c. 32, § 1. It cannot be gainsaid that travel per diem payments were not made in exchange for the individual services of the members. A General Court member living in Belmont presumably provides similar services as a member living in Amherst. The reason for the differential is the difference in the distance each must travel to Boston, not in the services provided once there.

The combination of the plain language of G. L. c. 32, § 9B, stating the purpose of the payments, the legislative history, and the fact that members received different travel per diem payments based on their residence (not years of service or any other service-based criteria), take these payments out of the realm of *Bulger* and into the purview of *O'Brien.* Unlike *Bulger,* there is no indication that the intent of the Legislature was anything other than stated. In the report dated April 4, 1974, to the Massachusetts General Court from the advisory board on legislative and constitutional officers' compensation, it specifically states: "[A] member who lives in the western part of the state carries an undue burden of expense for his personal travel to attend sessions unless there is some reimbursement by

the state; and if reimbursement is to be allowed for those members, it would be unfair to other members living closer to the State House if they were not to be compensated at all for their travel." House Bill No. 5625 (filed Apr. 4, 1974). That report further recommended that a member be given the travel per diem allowance only when actual travel expenses were incurred. Thus, the purpose of the travel per diem payments under § 9B was to reimburse a member for actual expenses incurred. We do not consider it a persuasive contrary fact that receipts did not need to be submitted in order to receive the travel per diem allowance.

(iii) *The parking space.* Parente, as well as other members of the General Court, was given access to a parking space to use while working at the State house. Parente claims that the fair market value of the parking space should be considered "regular compensation" for purposes of her retirement calculation. The value of the parking space is approximately $1,560 per year. We decline to include this value in the definition of "regular compensation" pursuant to G. L. c. 32, § 1. As the Supreme Judicial Court recognized in *Pelonzi,* "regular compensation" is not created when an employer supplies an employee "with other non-cash job related accessories and benefits (e.g., cellular telephones, personal computers, facsimile machines, *parking spaces*) to enable their employees to perform their jobs more efficiently, and may authorize the personal use of these benefits as a matter of convenience" (emphasis supplied). *Pelonzi,* 451 Mass. at 482.

*Judgment affirmed.*