WILLIAM M. BULGER *vs.* CONTRIBUTORY RETIREMENT
APPEAL BOARD.

Suffolk. October 5, 2006. - November 9, 2006.

Present: MARSHALL, C.J., GREANEY, SPINA, COWIN, & SOSMAN, JJ.

*Retirement. Public Employment,* Retirement. *Administrative Law,* Decision,
Judicial review. *Contributory Retirement Appeal Board. Statute,*
Construction. *Words,* "Regular compensation."

This court concluded that payments to the plaintiff, a retiree from public
   service, in the form of a monthly cash housing allowance were includable
   as an element of "regular compensation" as that term is defined by G. L.
   c. 32, § 1, for purposes of calculating the retirement allowance to which
   he was entitled [657-660], but payments made in his name by his employer
   after a certain date into an annuity fund that was not authorized by G. L.
   c. 15, § 18A, were not includable [660-661].

CIVIL ACTION commenced in the Superior Court Department on
March 16, 2005.

The case was heard by *Ernest B. Murphy,* J., on motions for
judgment on the pleadings.

The Supreme Judicial Court granted an application for direct
appellate review.

*Judy Zeprun Kalman,* Assistant Attorney General, for the
defendant.

*Thomas R. Kiley* for the plaintiff.

GREANEY, J. William M. Bulger was employed by the Com-
monwealth for forty-two years, having served in the Mas-
sachusetts General Court from 1961 until 1995 (the last
seventeen years as President of the Senate), and as president of
the University of Massachusetts (university) from 1996 until his
resignation on September 1, 2003. On that date he became
eligible for a superannuation retirement allowance under our
State retirement system in accordance with G. L. c. 32, § 5 (1).
This case requires us to decide whether payments to Bulger in

the form of a monthly cash housing allowance, and payments made by the university into an annuity fund in his name, qualify as "regular compensation," as that term is defined by G. L. c. 32, § 1, for purposes of calculating the retirement allowance to which he is entitled. The Contributory Retirement Appeal Board (CRAB) determined that the payments did not so qualify, and Bulger sought judicial review of CRAB's decision pursuant to G. L. c. 30A, § 14. A judge in the Superior Court concluded that CRAB had erred and, consequently, allowed Bulger's motion to amend CRAB's decision to include as "regular compensation" the housing allowance payments and those annuity payments made from January 5, 2001, until August 31, 2003. We granted CRAB's application for direct appellate review. For reasons that follow, we conclude that the value of Bulger's monthly housing allowance is includable as an element of "regular compensation" under § 1, but that the annuity payments made on his behalf are not.

1. The relevant facts, summarized below, were established by stipulation of the parties at a hearing before the division of administrative law appeals (DALA), and they were adopted by CRAB. Only the final three years of Bulger's employment, from September 1, 2000, until August 31, 2003, are material to this appeal. Bulger and the board of trustees of the university (trustees) negotiated the terms of his compensation for those years, and those terms are set forth in three letter agreements dated October 28, 1998; October 1, 2000; and June 3, 2002. From September 1, 2000, until June 30, 2001, Bulger's salary was $280,000 a year. From July 1, 2001, until his resignation, his salary was $309,000 a year. Throughout the relevant three-year period, Bulger also received a monthly cash housing allowance of $2,419, a benefit provided pursuant to the university's executive compensation package and applicable to the president of the university and each chancellor of the university's five campuses. In relevant part, the executive compensation package states:

> "A monthly housing allowance in an amount established by the Board of Trustees at the time of appointment, shall be paid to the President and to each Chancellor who does

not have a campus residence. In addition, cleaning and catering expenses directly related to University business events shall be reimbursed. As a condition of employment, a Chancellor may be required to live in a campus-provided residence."

Bulger received his housing allowance as part of his regular paycheck, and at all relevant times, he treated the allowance as taxable income on his Federal and State tax returns.[1]

An additional benefit provided pursuant to the executive compensation package was monthly contributions, equal to seven per cent of Bulger's annual base salary, to an annuity fund. The letter agreement of October 28, 1998, in relevant part, stated:

"Said fund shall be in the name of the University and in the event that prior to January 4, 2001, you shall leave the employ of the University . . . then all amounts deposited in the fund and all earnings thereon shall remain the property of the University and you shall forfeit all rights to said funds. In the event that you remain as President of the University until January 4, 2001, on that date all amounts deposited in said fund and all earnings thereon shall be distributed to you [and in] the event you remain as President after July, 2003, any further payments into an investment fund shall be in an amount and under such terms and conditions as shall be determined by the Board Chair after consultation with you."

The letter agreement of October 1, 2000, designated that "[c]ommencing on January 5, 2001 and annually thereafter, as part of your regular compensation, the University shall deposit into a 401A account or other appropriate tax-deferred investment vehicle of your choice an amount equal to seven per cent (7%) of your base salary in each year." This language was modified in the letter agreement of June 3, 2002, as follows: "As part of your regular compensation, the University shall deposit into a 403(b) account or other appropriate tax-deferred

---

[1]The record reflects that in 1996 and 1997, Bulger declined to accept the housing allowance payments to which he was entitled. Those payments went to the University of Massachusetts Foundation as a charitable contribution.

investment vehicle of your choice an amount equal to seven per cent (7%) of your base salary in each year." In accordance with the letter agreements, the university made monthly contributions in Bulger's name into a tax-deferred investment account entitled "The Vanguard Group 401(a) Executive Retirement Plan" (Vanguard account).[2] The Vanguard account was the only such retirement plan Bulger used while president of the university. No pension deductions were taken by the university on the funds deposited into the Vanguard account or on the value of the monthly housing allowance received by Bulger.

As has been stated, Bulger resigned from his position as president of the university, effective September 1, 2003, and shortly thereafter submitted an application to receive his superannuation retirement allowance. General Laws c. 32, § 5 (2) (a), sets forth the basic formula for computing a member's superannuation retirement allowance, which is a factor of three components: (1) the member's age at retirement; (2) the number of years of service to the Commonwealth; and (3) the average annual rate of "regular compensation received by such member[3] during any period of three consecutive years of creditable service" or during the "last three years of creditable service preceding retirement," whichever is greater (for our purposes, the last three years of Bulger's term as university president). Bulger's application to the State Board of Retirement (board) included a request that his monthly housing allowance and the payments into the Vanguard account in his name be included as part of his "regular compensation" for purposes of computing

---

[2]The record contains no information on the Vanguard account other than the fact that funds ($1,635 from January, 2001, until November, 2002; $4,659 in December 2002; and $1,803 thereafter) were deposited into the account monthly by the university.

[3]The qualification that the compensation must be "received by [a] member" implies neither that all compensation received by a member must be treated as "regular compensation" nor, as argued by CRAB, that compensation must literally be received during the relevant pay period. We have stated that the modifying clause "ensures that *only* years of creditable service are considered in determining the highest three-year average annual rate of regular compensation. It does not alter the definition of regular compensation." (Emphasis original.) *Leary* v. *Contributory Retirement Appeal Bd.*, 421 Mass. 344, 347 (1995).

his retirement allowance.[4] In a letter of decision dated September 26, 2003, the board allowed Bulger's application for benefits, but denied his request to include his cash housing allowance and annuity payments in computing his retirement allowance.

Bulger appealed from the board's decision to CRAB. See G. L. c. 32, § 16 (4). CRAB assigned the appeal for a hearing before DALA, and the parties elected to waive a hearing and to submit the case on documents. The administrative magistrate issued a decision reversing the board's decision and allowing the housing allowance and annuity payments to be included as elements of Bulger's "regular compensation." CRAB adopted the magistrate's findings of fact, but did not accept her conclusion and order, ruling that the "only element of [Bulger's] compensation package that is includable as regular compensation for purposes of calculating his pension is his base salary . . . . All other payments are excluded . . . ."[5] Bulger sought judicial review of CRAB's decision in the Superior Court, G. L. c. 30A, § 14 (1), and CRAB entered a cross appeal.

Considering the parties' cross motions for judgment on the pleadings, a Superior Court judge reversed CRAB's decision and allowed Bulger's motion to amend the decision to include as "regular compensation" both the housing allowance payments as well as the payments to the Vanguard account from January 5, 2001, until August 31, 2003.[6] Relying on decisions of this court interpreting "regular compensation" to include

---

[4]Because the university had not made pension deductions on the housing allowance payments or the annuity payments, Bulger tendered to the State Board of Retirement (board) a personal check for $14,659.85, the amount calculated by Bulger to be equivalent to what should have been deducted from those components of his compensation up to the time of his resignation. Bulger also informed the board that he would pay any accumulated interest on the undeducted amount when the appropriate sum had been calculated by the board. The board returned his check. The parties have stipulated that, should Bulger be successful in this appeal, he would tender the appropriate amount of pension deductions.

[5]CRAB's decision included a review of other elements of Bulger's compensation package beyond the two elements involved in this appeal.

[6]"Regular compensation" as defined by G. L. c. 32, § 1, expressly does not include any "bonus, overtime, severance pay for any and all unused sick leave, early retirement incentives, or any other payments made as a result of giving notice of retirement." Bulger now concedes that any payment into the

recurrent payments that are not inflated by extraordinary ad hoc payments such as bonuses or overtime pay, see *Bower* v. *Contributory Retirement Appeal Bd.*, 393 Mass. 427, 429 (1984); *Boston Ass'n of Sch. Adm'rs & Supervisors* v. *Boston Retirement Bd.*, 383 Mass. 336, 339-340 (1981), and recognizing that the failure to take deductions from an employee's "non-salary compensation" has never been considered a dispositive factor in determining whether that compensation falls within the definition of "regular compensation," G. L. c. 32, § 1, for purposes of calculating an applicant's retirement benefit, see, e.g., *Bower* v. *Contributory Retirement Appeal Bd.*, *supra*, the judge concluded that the cash housing allowance paid to Bulger throughout the relevant three-year period qualified as "regular compensation."

Considering the funds paid into the Vanguard account in Bulger's name from January 5, 2001, onward, the judge reasoned that § 1 expressly includes "premiums paid by any governmental unit for the purchase of an individual or group annuity contract as authorized by [G. L. c. 15, § 18A],"[7] which authorizes the university to purchase, on behalf of any employee, "an individual or group annuity contract or any other investment approved by the internal revenue service guidelines relative to [§] 403(b) of the Internal Revenue Code [I.R.C.]." The judge further reasoned that, although the Vanguard account, ostensibly by its name, appeared to qualify for deferred tax treatment under I.R.C. § 401(a), it nevertheless also met requirements for tax deferred status under I.R.C. § 403(b). The judge concluded that the Vanguard account was an annuity plan authorized under G. L. c. 15, § 18A, and, therefore, was "regular compensation" under G. L. c. 32, § 1. On the basis of his conclusions, the judge allowed Bulger's motion to amend the CRAB decision to include as "regular compensation" funds

Vanguard account made before January 5, 2001, was not compensation for his services but, essentially, a bonus contingent on his remaining in his position as university president through January 4, 2001, and, therefore, does not qualify as "regular compensation."

[7]The parties agree that a second type of annuity payments expressly included as "regular compensation" within G. L. c. 32, § 1, paid into a plan authorized by G. L. c. 71, § 37B, is not applicable here.

paid to him as a monthly cash housing allowance and payments made into the Vanguard account after January 5, 2001.

2. In reviewing CRAB's decision that the statutory definition of "regular compensation" encompasses neither the housing allowance nor the annuity payments, we are required to give "due weight to the experience, technical competence, and specialized knowledge of the agency, as well as to the discretionary authority conferred upon it." G. L. c. 30A, § 14 (7). See *Brackett* v. *Civil Serv. Comm'n, ante* 233, 241-242 (2006), and cases cited. We exercise de novo review of legal questions, however, and we must overturn agency decisions that are not consistent with governing law. See *Plymouth* v. *Civil Serv. Comm'n*, 426 Mass. 1, 5 (1997); *Boston Police Superior Officers Fed'n* v. *Labor Relations Comm'n*, 410 Mass. 890, 892 (1991); *Raytheon Co.* v. *Director of the Div. of Employment Sec.*, 364 Mass. 593, 595 (1974). The only dispute is whether the term "regular compensation," as defined by the Legislature in G. L. c. 32, § 1, encompasses (a) the cash housing allowances received by Bulger, and (b) the payments by the university into the Vanguard account after January 5, 2001.

We begin with the language of the statute. See *Leary* v. *Contributory Retirement Appeal Bd.*, 421 Mass. 344, 345-346 (1995). See also *Simon* v. *State Examiners of Electricians*, 395 Mass. 238, 242 (1985). General Laws c. 32, § 1, provides, in relevant part:

> " 'Regular compensation' . . . shall mean the salary, wages or other compensation in whatever form, lawfully determined for the individual service of the employee by the employing authority,[8] not including bonus, overtime, severance pay for any and all unused sick leave, early retirement incentives, or any other payments made as a result of giving notice of retirement . . . . Regular compensation shall also include all premiums paid by any

[8]Although the term "employing authority" is not defined in the statute, § 1 defines the term "[e]mployer" as the "person, board, or commission with the power to appoint or employ personnel as employees of the commonwealth." For our purposes, the terms are synonymous. The employing authority for the president of the university is its board of trustees. See G. L. c. 75, §§ 1, 11, 14.

governmental unit for the purchase of an individual or group annuity contract as authorized by [G. L. c. 15, § 18A,] or [G. L. c. 71, § 37B]."

The statutory language is straightforward and unambiguous. We have recognized that the expression "regular compensation" "point[s] to recurrent or repeated amounts of compensation not inflated by extraordinary ad hoc payments. . . . [M]oreover 'regular,' as it modifies 'compensation,' imports the idea of ordinariness or normality as well as the idea of recurrence." *Bower* v. *Contributory Retirement Appeal Bd.*, *supra* at 429, quoting *Boston Ass'n of Sch. Adm'rs & Supervisors* v. *Boston Retirement Bd.*, *supra* at 341. The use of the terms "salary, wages or other compensation in whatever form," denotes, unquestionably in our minds, a legislative intent to include the many distinct ways in which individuals are paid for their services. See *Hallett* v. *Contributory Retirement Appeal Bd.*, 431 Mass. 66, 69 (2000). As wages have a meaning apart from salary, see *id.* at 68-69, so "other compensation in whatever form" must be understood to encompass all other forms of recurring payments for an employee's services, so long as the payments comport with the other requirements of § 1.

The housing allowance payments at issue were "recurrent," "regular," and "ordinary" remuneration for Bulger's services as president of the university. We do not accept CRAB's characterization of the housing payments as an "administratively workable method" designed by the trustees to reimburse Bulger for the additional expenses generally associated with maintaining a residence consistent with the position of president of the university and suitable for entertainment purposes. CRAB's position ignores the factual findings of DALA, which were adopted by CRAB, regarding the manner in which the trustees established the housing allowance as part of Bulger's compensation package. According to those findings (which, as stated, were based on the parties' stipulations), the housing allowance was never intended to be used for housing. The trustees were fully aware that Bulger would continue to live in his home in the south Boston section of Boston throughout his tenure as president of the university. According to the chairperson of the

trustees who was responsible for negotiating Bulger's compensation package in 1998, the trustees felt at that time that Bulger had done an outstanding job as university president and considered Bulger's acceptance of a housing allowance as an important enhancement of his compensation package that would motivate his interest in the presidency for an additional five-year term. In view of these circumstances, treating the housing allowance as anything other than "other compensation in whatever form" would render that term in the statute meaningless. "Unless it is a technical term, 'words and phrases [in a statute] shall be construed according to [their] common and approved usage.' " *Hallett* v. *Contributory Retirement Appeal Bd., supra* at 68, quoting G. L. c. 4, § 6, Third. See *State Bd. of Retirement* v. *Boston Retirement Bd.*, 391 Mass. 92, 94 (1984) ("we need not look beyond the words of the statute where the language is plain and unambiguous").[9]

CRAB places improper emphasis on the fact that the university's payroll officials did not take regular payroll deductions, as authorized pursuant to G. L. c. 32, § 22 (1) (*b*), from the housing allowance payments. This fact would be of concern were we dealing with payments made before 1945. Section 1 defines "[r]egular compensation" paid prior to that year as "the full salary, wages or other compensation in whatever form, lawfully determined for the individual service of the employee by the employing authority, *from which regular deductions were made* pursuant to the provisions of chapter 32" (emphasis supplied). The Legislature did not include that phrase, however, in relation to compensation paid after 1945. We must assume that the distinction was purposeful. See *Commonwealth* v. *Connor C.*, 432 Mass. 635, 640 (2000); *Leary* v. *Contributory Retirement Appeal Bd.*, 421 Mass. 344, 348 (1995); *Morrison* v. *Lennett*, 415 Mass. 857, 863 (1993). As stated by the Appeals Court in *Forbush* v. *Lynn*, 35 Mass. App. Ct. 696, 701 (1994),

---

[9]We also note that G. L. c. 32, § 22 (1) (*c*), requires a disbursing officer to treat the value of non-cash maintenance allowances in the form of full or partial boarding and housing as a component of an employee's regular compensation. There would be no logic to a statutory scheme that treated the value of an employee's use of housing supplied by an employer as "regular compensation," but did not treat a cash housing allowance as "regular compensation."

we should be "differentially precise in according discrete, and not identical, meanings" to separate, yet related, standards reflected in statutory language. That principle has additional force when dealing with statutory definitions, and "[a] definition [that] declares what a term means . . . excludes any meaning that is not stated." *Perez* v. *Bay State Ambulance & Hosp. Rental Serv., Inc.*, 413 Mass. 670, 675 (1992), quoting *Colautti* v. *Franklin*, 439 U.S. 379, 392 n.10 (1979). The fact that payroll deductions were not taken from the housing allowance payments simply is not a decisive factor. See *Bower* v. *Contributory Retirement Appeal Bd., supra*; *Kozloski* v. *Contributory Retirement Appeal Bd.*, 61 Mass. App. Ct. 783, 785 n.3 (2004); *Varella* v. *Contributory Retirement Appeal Bd.*, 56 Mass. App. Ct. 384, 385-386 (2002). As this court recognized in *Boston Retirement Bd.* v. *McCormick*, 345 Mass. 692, 698 (1963), "[t]he statute is designed to give each member specified retirement benefits in accordance with standards stated in the statute. We see nothing in the statute which prevents a member from receiving those benefits because of an honest error which can readily and fairly be corrected." See *id.* at 698 & n.5 (identifying G. L. c. 32, § 20 [5] [*c*], as the statutory mechanism for correcting errors). See *Hollstein* v. *Contributory Retirement Appeal Bd.*, 47 Mass. App. Ct. 109, 110-111 (1999). We conclude that the housing allowance payments should be included as "regular compensation" in the computation of Bulger's retirement allowance.

The payments into the Vanguard account, on the other hand, fail to meet the threshold requirements of G. L. c. 32, § 1. As has been discussed, the Superior Court judge determined that the account qualified to receive deferred tax treatment under both § 401(a) (hence, we presume, its name) and § 403(b) of the I.R.C., and concluded, therefore, that the monthly contributions paid into that plan were included within § 1 as "premiums paid [into] an individual or group annuity contract as authorized by [G. L. c. 15, § 18A]."

We need not address the merits of this analysis because, rather than relying on the judge's conclusion, Bulger concedes in his brief that the Vanguard account is not of the type authorized by G. L. c. 15, § 18A. He argues instead that the

payments qualify as "regular compensation," not because they literally fall within the scope of G. L. c. 15, § 18A, but because they reflect "salary, wages or other compensation in whatever form, lawfully determined for the individual service of [Bulger] by the [trustees]." Bulger's position, in essence, is that the payments must be "regular compensation" because that is how the payments were characterized by the trustees in the letter agreements of October 1, 2000, and June 3, 2002, both of which provided, "[a]s part of your regular compensation, the University shall deposit . . . ." We do not agree.

The statutory definition is precise and makes clear that "regular compensation" does not extend to payments made into an annuity fund on an employee's behalf unless that fund is authorized by G. L. c. 15, § 18A, or by G. L. c. 71, § 37B. Neither of those carefully drawn exceptions is applicable here. We cannot read into the statute a legislative intent to include other types of annuity contracts, based on their similarity to those exceptions already contained in the statute, or based on the terminology that parties might choose to call the payments in the employment agreement. See *Boston Ass'n of Sch. Adm'rs & Supervisors* v. *Boston Retirement Bd.*, 383 Mass. 336, 339-340 (1981). See also *Commissioner of Revenue* v. *Cargill, Inc.*, 429 Mass. 79, 82 (1999) ("Where, as here, the language of the statute is clear, it is the function of the judiciary to apply it, not amend it"). To do so would undermine the legislative goal of ensuring "a minimum level of predictability in computing pension payments made out of the retirement system." *Zelesky* v. *Commissioner of the Div. of Pub. Employee Retirement Admin.*, 30 Mass. App. Ct. 106, 109 (1991).

3. We address briefly a matter that is unrelated to the question of statutory interpretation at issue in this case. On February 3, 2005 (after DALA had made its findings in the case and before CRAB had reached its decision), an article authored by Timothy Cahill, the treasurer of the Commonwealth, appeared on the "op-ed" page of The Boston Globe. The article was entitled "Bulger Payout Threatens Pension System" and presented arguments as to why, in Cahill's opinion, Bulger's appeal before CRAB should be denied. Bulger contended before the Superior Court judge that the article constituted an illegal ex

parte communication that unduly influenced the final decision of CRAB. He filed a motion requesting the judge to vacate the CRAB decision and allow him to conduct further discovery concerning his allegations. The judge denied Bulger's motion.

Bulger has appealed from that portion of the judge's order denying his motion. Bulger's claim of procedural irregularities has, for the most part, been rendered moot by our decision. To the extent that it technically remains alive, we reject it, essentially for the same reasons given by the judge: (1) there is insufficient evidence in the record to establish any impropriety in the manner in which CRAB reached its decision; (2) the article presented no factual information on which CRAB might have impermissibly relied, beyond that already contained in the administrative record; (3) it was Bulger himself (through counsel) who initially brought the article to CRAB's attention by requesting that his objection to the article be noted in the record; (4) CRAB complied with this request and expressly stated that it did not consider the article substantively while reaching its decision; and, finally, (5) there is no substantive evidence to demonstrate that this express statement might not be true. No discovery in connection with CRAB's deliberations was warranted in these circumstances. See *Cushing* v. *Fire Comm'r of Brookline*, 345 Mass. 418, 422 (1963); *Newcomb* v. *Aldermen of Holyoke*, 271 Mass. 565, 569 (1930) ("Good faith is always assumed").

4. That portion of the judgment of November 29, 2005, ordering that the payments made into an "investment fund" held in Bulger's name, from January 5, 2001, through August 31, 2003, shall be included in his "regular compensation" is vacated. The judgment is modified to direct that the payments made on his behalf into the investment fund are not part of his "regular compensation." As modified, the judgment is affirmed.

*So ordered.*