NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

SJC-11864


   GREGORY T. MAGAZU & another[1] vs.  DEPARTMENT OF CHILDREN AND
                          FAMILIES.



        Worcester.     September 10, 2015. - January 4, 2016.

   Present:  Gants, C.J., Spina, Cordy, Botsford, Duffly, Lenk, &
                          Hines, JJ.



Department of Children & Families.  Adoption, Foster parents.
     Constitutional Law, Freedom of religion.  Religion.
     Administrative Law, Substantial evidence.



        Civil action commenced in the Superior Court Department on
July 25, 2013.

        The case was heard by Brian A. Davis, J., on a motion for
judgment on the pleadings.

        The Supreme Judicial Court on its own initiative
transferred the case from the Appeals Court.


        David P. Bodanza (Amanda M. Mastalerz with him) for the
plaintiffs.
        Annapurna Balakrishna, Assistant Attorney General, for the
defendant.



---

        [1] Melanie A. Magazu.

SPINA, J. Gregory T. Magazu and his wife, Melanie, appeal from a judgment of the Superior Court that dismissed their appeal from a final decision of the Department of Children and Families (department) denying their application to become foster and preadoptive parents because of their use of corporal punishment as a form of discipline in their home. The Magazus argue that the department's decision is inconsistent with its regulations, is arbitrary and capricious, and is not supported by substantial evidence where they were willing to agree not to use corporal punishment on a foster child. They also contend that, because physical discipline is an integral aspect of their Christian faith, the department's decision impermissibly infringes on their constitutional right to the free exercise of religion. We transferred the case to this court on our own motion. For the reasons that follow, we conclude that the department's decision to deny the Magazus' application is based on a reasonable interpretation of its enabling legislation and related regulations, is not arbitrary or capricious, and is supported by substantial evidence. We also conclude that although the department's decision imposes a substantial burden on the Magazus' sincerely held religious beliefs, this burden is outweighed by the department's compelling interest in protecting the physical and emotional well-being of foster children. Accordingly, we affirm the judgment of the Superior Court.

1. <u>Statutory and regulatory framework</u>. We begin with an overview of the relevant statutory and regulatory provisions that govern the foster care proceedings in this case. The Legislature has vested the department with the authority to provide substitute care for children when "the family itself or the resources available to the family are unable to provide the necessary care and protection to insure the rights of any child to sound health and normal physical, mental, spiritual and moral development." G. L. c. 119, § 1. See <u>Blixt</u> v. <u>Blixt</u>, 437 Mass. 649, 663 (2002), cert. denied, 537 U.S. 1189 (2003) (State has compelling interest in keeping children safe from physical or emotional trauma that may scar them well into adulthood). In providing such care, "[t]he health and safety of the child shall be of paramount concern and shall include the long-term well-being of the child." G. L. c. 119, § 1. The department shall define the "best interests of the child" as including, among other considerations, "the effectiveness, suitability and adequacy of . . . placement decisions." <u>Id</u>.

In accordance with its authority, the department has promulgated regulations concerning eligibility requirements and standards of licensure for a foster or preadoptive parent. See 110 Code Mass. Regs. §§ 7.100, 7.104 (2009). See also G. L. c. 119, § 37 ("The department shall make rules and regulations concerning the administration of its duties"). The department

is required to evaluate an applicant's home and all members of the household. See 102 Code Mass. Regs. § 5.10(5) (1998). The assessment shall be completed by a social worker who has met specified qualifications, see 102 Code Mass. Regs. §§ 5.05(2), 5.10(11)-(12) (1998), and must document, among other things, "parenting ability, including child rearing and discipline." 102 Code Mass. Regs. § 5.10(5)(d)(6). An applicant must demonstrate, to the satisfaction of the department, numerous attributes, including "the ability: (a) to assure that a child placed in his or her care will experience a safe, supportive, nurturing and stable family environment which is free from abuse or neglect; . . . (d) to promote the physical, mental, and emotional well-being of a child placed in his or her care . . . ; and (q) to assume and carry out all other responsibilities of a foster/pre-adoptive parent as detailed in the standard written agreement between the [d]epartment and foster/pre-adoptive parents." 110 Code Mass. Regs. § 7.104(1).

Within ten working days after the completion of its comprehensive assessment, the department shall decide whether to license the applicant, see 110 Code Mass. Regs. § 7.107(5) (2009), and within ten working days thereafter shall provide written notice of its decision to the applicant. See id. at § 7.107(6). In those cases where the department decides not to license the applicant, the written notice must include the

reasons for such decision, as well as information about the applicant's right to appeal the determination. See id. at § 7.107(6)(b). The regulations provide that once an applicant has been licensed as a foster parent and has completed the requisite parent training, the department and the foster parent shall enter into a written agreement that will govern the foster care arrangement. See 102 Code Mass. Regs. § 5.10(7)(a); 110 Code Mass. Regs. § 7.111 (2009). The agreement "shall be renewed annually, and shall include at least the following terms: . . . (3) a prohibition against the use of any form of corporal punishment by foster/pre-adoptive parents upon any foster child(ren)." 110 Code Mass. Regs. § 7.111(3). The department shall reimburse foster parents for each child placed in their home at rates that the department has established for the provision of foster care. See 110 Code Mass. Regs. § 7.130(1) (2008).

2. Factual and procedural background. The Magazus are a married couple whose lives are guided by their deeply held Christian beliefs. They have two young daughters. In September, 2012, the Magazus filed an application with the department for a "family resource license" that would enable them to become foster and preadoptive parents.[2] During the

_____

[2] It was the Magazus' intention to eventually adopt one or more of the foster children placed in their care. Consequently,

application process, they completed the "Massachusetts Approach to Partnership in Parenting" training program and the "Family Resource License Study" (license study), as required by the department's regulations. See 110 Code Mass. Regs. § 7.107(1), (2) (2009). As part of the license study, the department asked the Magazus about their personal histories as well as their parenting experiences and attitudes, including methods of discipline. In response to the department's questions, the Magazus stated that they "have used physical discipline on their daughters," and that such discipline is "appropriate when there is a continuous pattern of disobedience." More specifically, they explained that their parenting style includes "spanking on the buttocks, using Greg or Melanie's hand, in the privacy of their bed room so that [the children] are not humiliated in front of others."

The Magazus "feel [that physical discipline] is a small part of their parenting style, and only used when necessary." They acknowledged their understanding of the department's policy against corporal punishment, and expressed a willingness to refrain from using physical discipline on a foster child placed in their home. Because they discipline their own two daughters

---

from the beginning of the application process, the department assessed the Magazus as a permanent placement. For ease of reference, we refer to the status of the Magazus during these proceedings simply as foster parents.

in private, the Magazus are of the view that a foster child would not actually witness any corporal punishment. Throughout the application process, the Magazus were forthcoming, honest, and cooperative in answering the department's inquiries, and they thought that they had been portrayed accurately and fairly in the license study.

By decision dated February 7, 2013, the department notified the Magazus that their application had been denied because of their use of corporal punishment, and their expressed belief that such punishment "is an appropriate and effective means of discipline for [their] children." The department determined that the Magazus had not met specific licensing standards, including the ability to sign the department's standard written agreement prohibiting the use of any form of corporal punishment on a foster child. See 110 Code Mass. Regs. §§ 7.104(1)(q), 7.111(3). Therefore, the department concluded that it was unable to license the Magazus as an unrestricted foster or adoptive family.

The Magazus made a timely request for a so-called "fair hearing" pursuant to 110 Code Mass. Regs. § 10.06(4)(a) (2008). An evidentiary hearing was held on May 8, 2013, at which the Maguzus testified, as did three witnesses on behalf of the department. On June 24, 2013, a hearing officer affirmed the

decision of the department not to approve the Magazus' application to become foster parents.

The hearing officer concluded that the Magazus had failed to show by a preponderance of the evidence that the decision did not conform with the department's regulations and policies, or that it was unreasonable. She found that the department expressly prohibits the use of corporal punishment on foster children, see 110 Code Mass. Regs. § 7.111(3), and that the department's "clinical practice" prohibits exposing foster children to the use of corporal punishment on other children in a household. The hearing officer highlighted the Magazus' inability "to recognize that the employment of physical punishment [on] any child in their home could lead to serious emotional consequences for the [d]epartment[']s children." She pointed out that children placed by the department have been exposed to an array of neglect and abuse, and their awareness of acts of corporal punishment in their foster homes "could well trigger the very trauma the placement was intended to mitigate." The hearing officer stated that the department could not simply place with the Magazus a child who had not been physically abused because foster children often do not disclose the full extent of their experiences until after being placed in substitute care. Moreover, she continued, the Magazus' willingness to refrain from using corporal punishment on a

foster child did not alleviate the department's concerns regarding the discipline of such child postadoption, when the child would no longer be under the purview of the department. The hearing officer found that the Magazus are "people of deep faith," but she stated that there was no evidence to support their assertion that the denial of their application was due to their Christian beliefs. Recognizing that the Magazus have "a sincere desire to offer permanency to children in need," the hearing officer said that, even though the Magazus could not provide foster care for children placed by the department, they were free to pursue adoption through another agency that might be more compatible with their values.

The Magazus appealed the department's decision by filing a complaint for judicial review in the Superior Court pursuant to G. L. c. 30A, § 14. They alleged that their substantial rights had been prejudiced because the department's decision violated constitutional provisions (§ 14 [7] [a]), exceeded the department's authority (§ 14 [7] [b]), was based on errors of law (§ 14 [7] [c]), was not supported by substantial evidence (§ 14 [7] [e]), and was arbitrary or capricious (§ 14 [7] [g]). The Magazus also alleged that the department had violated their right to the free exercise of religion under the Federal and State Constitutions. The department filed the administrative record as its answer. Thereafter, the Magazus filed a motion

for judgment on the pleadings pursuant to Mass. R. Civ. P. 12 (c), 365 Mass. 754 (1974), and Standing Order 1-96(4) of the Superior Court, Mass. Ann. Laws Court Rules, at 1138-1139 (LexisNexis 2015-2016).

Following a hearing, a judge denied the Magazus' motion for judgment on the pleadings and dismissed their complaint.  The judge first concluded that the Magazus' substantial rights had not been prejudiced by the department's decision, and, therefore, they were not entitled to relief under G. L. c. 30A, § 14 (7) (b), (c), (e), or (g).  He stated that the administrative record in this case contained substantial evidence to support the department's rational belief that children who already have been traumatized by abuse should not be subjected to corporal punishment in their foster or adoptive homes, either directly or indirectly, for fear that the experience will revive or exacerbate their trauma.  Further, the judge continued, the administrative record contained substantial evidence to show that the department's decision to deny the Magazus' application did not result from its desire to meddle in the Magazus' parenting of their own two daughters.  Rather, the decision reflected the department's genuine concern that a foster child placed in the Magazus' care "likely would be subjected to potentially traumatic episodes of corporal punishment, if only from a distance, and that any child the

[Magazus] ultimately might adopt likely would be subjected to potentially traumatic episodes of corporal punishment in a very direct way." Having determined that a substantial evidentiary basis existed for the department's concerns, the judge stated that the department had acted in a reasonable manner according to its statutory and regulatory authority in denying the Magazus' application to become foster parents.

The judge next concluded that the Magazus were not entitled to relief under G. L. c. 30A, § 14 (7) (a), for the purported violation of their constitutional right to the free exercise of religion. Relying on Wisconsin v. Yoder, 406 U.S. 205 (1972), and Attorney Gen. v. Desilets, 418 Mass. 316 (1994), the judge stated that the department's decision did not impose a "substantial burden" on the Magazus' ability to exercise their sincerely held religious beliefs. In the judge's view, the department's decision did not prevent the Magazus from disciplining their own two daughters in accordance with their Christian values, or otherwise coerce the Magazus into acting in violation of those values. Rather, the judge continued, such decision merely precluded the Magazus -- for wholly secular reasons -- from subjecting any child in the department's care to the Magazus' religiously based disciplinary practices. The

judge determined that this result did not violate the Magazus' constitutional rights.[3]  The present appeal ensued.

3.  Standard of review.  Judicial review of a decision by the department is governed by G. L. c. 30A, § 14, and is "confined to the record," except in limited circumstances not present here.  Id. at § 14 (5).  See 110 Code Mass. Regs. § 10.30 (2008) (decision by hearing officer is final decision of department and is subject to appeal under G. L. c. 30A).  A reviewing court will not disturb the department's decision unless it determines that "the substantial rights of any party may have been prejudiced" because the decision was (a) in violation of constitutional provisions; (b) in excess of the department's authority or jurisdiction; (c) based on an error of law; (d) made on unlawful procedure; (e) unsupported by substantial evidence; (f) unwarranted by the facts; or (g) arbitrary or capricious, an abuse of discretion, or otherwise not in accordance with law.  G. L. c. 30A, § 14 (7).  See Doe, Sex Offender Registry Bd. No. 68549 v. Sex Offender Registry

---

[3] Because the judge concluded that the Magazus had not satisfied their initial burden of demonstrating that the department's denial of their application imposed a "substantial burden" on their right to freely exercise their religious beliefs, the judge did not consider whether the department's prohibition on subjecting foster children to corporal punishment "pursues an unusually important governmental goal," and whether granting the Magazus an exemption from such prohibition "would substantially hinder the fulfillment of [that] goal."  Attorney Gen. v. Desilets, 418 Mass. 316, 323 (1994), quoting L.H. Tribe, American Constitutional Law § 14-12, at 1242 (2d ed. 1988).

Bd., 470 Mass. 102, 108-109 (2014). "The court shall give due weight to the experience, technical competence, and specialized knowledge of the [department], as well as to the discretionary authority conferred upon it." G. L. c. 30A, § 14 (7). See Bulger v. Contributory Retirement Appeal Bd., 447 Mass. 651, 657 (2006), and cases cited. "We ordinarily accord an agency's interpretation of its own regulation[s] considerable deference." Ten Local Citizen Group v. New England Wind, LLC, 457 Mass. 222, 228 (2010), quoting Warcewicz v. Department of Envtl. Protection, 410 Mass. 548, 550 (1991). See J.M. Hollister, LLC v. Architectural Access Bd., 469 Mass. 49, 55 (2014). Such deference, however, is not unlimited, and a reviewing court will overrule an agency's interpretation of its governing statutes and regulations where such interpretation is "not rational." Ten Local Citizen Group, supra. See J.M. Hollister, LLC, supra.

4. Right to relief under G. L. c. 30A, § 14 (7) (b), (c), (e), or (g). The Magazus contend that the department's regulations do not preclude foster parent applicants from using appropriate corporal punishment on their own children, or disqualify such applicants from licensure. Rather, they continue, the regulations only prohibit the use of corporal punishment on a foster child. The Magazus assert that, in accordance with 110 Code Mass. Regs. § 7.111(3), they were willing to sign and comply with the department's standard

written agreement that sets forth such prohibition. In their view, the department's concern that a foster child could be traumatized by living in a home where the foster parents' own children are physically disciplined is unwarranted where, as in this case, such corporal punishment would occur outside the sight and hearing of the foster child. Moreover, the Magazus argue that by effectively prohibiting the use of any physical discipline in a foster home, the department has improperly grafted a new requirement onto its regulations. The Magazus claim that, because the department's decision does not conform with its own regulations and is arbitrary and capricious, they have suffered substantial prejudice. Further, they continue, the department's decision is not based on substantial evidence where, in their view, they have satisfied all of the necessary requirements for licensure as foster parents. We disagree with the Magazus' contentions.[4]

---

[4] Pursuant to 110 Code Mass. Regs. § 7.107(6) (2009), the written notice not to license an applicant as a foster parent shall include "the reason(s) for the decision." The Magazus point out that the only two regulations specifically cited in the written notice were 110 Code Mass. Regs. §§ 7.104(1)(q) and 7.111(3) (2009), which require a foster parent to sign the department's standard written agreement prohibiting the use of corporal punishment on a foster child. That being the case, the Magazus seem to suggest that these are the only regulations on which the department's decision was based. Contrary to their suggestion, we read the entirety of the language in the written notice as more broadly informing the Magazus that the basis for the denial of their application was the department's concern about their use of corporal punishment, not merely their related

The Magazus have the burden of showing, by a preponderance of the evidence, that the department's decision "was not in conformity with [its] policies and/or regulations and resulted in substantial prejudice to the [Magazus]." 110 Code Mass. Regs. § 10.23(a) (2008). The Legislature has vested the department with the authority to arrange substitute care for children whose own families are unable to protect their best interests.[5] See G. L. c. 119, § 1. Consonant with its enabling legislation, the department has determined that an applicant for licensure as a foster parent must demonstrate, among other qualities, the ability "to promote the physical, mental, and emotional well-being of a child placed in his or her care." 110 Code Mass. Regs. § 7.104(1)(d). The department's unwritten policy of not placing a foster child in a home where the parents use corporal punishment on their own children falls under the umbrella of this regulation.

_____

inability to sign the written agreement. Indeed, the notice states that the licensing standards not met by the Magazus "include" their inability to satisfy 110 Code Mass. Regs. §§ 7.104(1)(q) and 7.111(3). The fact that the written notice did not specifically cite additional regulations pertaining to the department's responsibility to protect the safety and well-being of children placed in its care, see, e.g., 110 Code Mass. Regs. § 7.104(1)(d) (2009), is not significant where the reasons for the department's decision are readily apparent from the notice.

[5] We note that foster parents are "temporary contract service providers with a defined set of rights and responsibilities that clearly differs from those of a child's parents." Kerins v. Lima, 425 Mass. 108, 112 n.6 (1997).

At the fair hearing, Jamie Caron, the regional clinical director for the department, testified that corporal punishment is not appropriate for children in need of substitute care through the department, and that individuals who use this form of discipline in their homes have not been approved as foster parents. She and Patricia Savelli, the adoption licensing and development supervisor for the department, both explained that the department's explicit prohibition against the use of corporal punishment on foster children, see 110 Code Mass. Regs. § 7.111(3), arises from the fact that these children typically have a history of neglect or abuse.[6] Caron acknowledged that the department does not have a written policy stating that parents who use physical discipline on their own children will not be approved as foster parents. Nonetheless, she pointed out that the department has an obligation to evaluate the "family dynamics" of a household, including whether foster children are treated in the same manner as biological and adopted children,

---

[6] The resource materials provided to the Magazus as part of the "Massachusetts Approach to Partnership in Parenting" training program state, in relevant part, that "[f]or children/youths who have been abused, spanking or smacking can be terribly damaging. Sometimes, of course, a child/youth's foster parents will not know for certain that a child/youth has been physically or sexually abused until the child/youth's behavior in the foster home so indicates. Therefore, using alternatives to physical punishment has two important benefits. First, it minimizes the risk of additional injury to a child/youth. Second, it helps break the intergenerational cycle of physical abuse."

both at the time of the foster care placement and into the future, given that the department's mission is to find permanent homes for foster children.  Caron emphasized that the department's assessment is of "an overall family, family functioning, and how a child will fit into [a particular] home." She stated that "the use of corporal punishment for some children and not for others, can have a significant bearing on the family, those respective children's sense of belonging and their place within their family."  Further, she continued, "any significant discrepancies in the practices with respect to parenting kids can lead to some struggles or some issues that [the department] think[s] are not optimal for all the kids involved."  Caron expressed the department's belief that, where a foster child has been placed with "an open, expressive and communicative family," the foster child will be aware of and affected by the use of corporal punishment on other children in the home.  According to Savelli, a foster child exposed to this form of discipline could reexperience feelings of trauma based on the child's history.[7]  Caron stated that because the

---

[7] Pursuant to G. L. c. 30A, § 11 (5), pertaining to the conduct of adjudicatory proceedings before administrative agencies, such "[a]gencies may utilize their experience, technical competence, and specialized knowledge in the evaluation of the evidence presented to them."  Fair hearing officers who are employed by the department "shall have, at a minimum, two years of direct service experience as well as legal training and/or experience."  110 Code Mass. Regs. § 10.03

department could not always be certain about the precise nature and scope of a foster child's prior trauma, it was neither realistic nor feasible for the department to attempt to place with the Magazus only a foster child who had not been the victim of physical or sexual abuse.

In the department's opinion, what made this case unique was the fact that, notwithstanding their awareness of the department's policy against corporal punishment, the Magazus had made it clear during their assessment that physical discipline is an important, albeit infrequently used, aspect of their parenting style. That being the case, Caron testified that the department reasonably assumed and was concerned that if a foster child was placed with and subsequently adopted by the Magazus, the child eventually would be subjected to corporal punishment just like the Magazus' own daughters. The Magazus' willingness to sign the department's standard written agreement, stating

---

(2008). Consistent with the "great deference" we afford to the department's expertise and experience, Lindsay v. Department of Social Servs., 439 Mass. 789, 799 (2003), we conclude that the department was not required to present expert testimony regarding the harm that a foster child could experience as a consequence of being exposed to corporal punishment, either directly or indirectly, in a foster home. The hearing officer, based on her background and specialized knowledge, would have understood the nature and scope of such harm. See Alsabti v. Board of Registration in Med., 404 Mass. 547, 549 (1989), quoting New Boston Garden Corp. v. Assessors of Boston, 383 Mass. 456, 466 (1981) (agency's decision will be upheld if it "could have been made by reference to the logic of experience" [emphasis in original]).

that they would not use corporal punishment on a foster child, did not alleviate the department's concerns about the use of physical discipline in the home and the use of such discipline on a foster child after adoption. In light of the Magazus' values and practices concerning discipline, which were not compatible with the department's expectations, Caron stated that the Magazus were not a "suitable match" for the department.[8]

Although 110 Code Mass. Regs. § 7.111(3) explicitly forbids the use of corporal punishment on a foster child, we agree with the Magazus that the department's policy and practice of not placing a foster child in a home where parents administer physical discipline to their own children is not similarly articulated in express terms. Nonetheless, we conclude that such a policy falls squarely within the parameters of the department's enabling legislation and companion regulations, and

---

[8] We note that in the context of criminal proceedings charging a father with assault and battery for spanking his minor child, we recently held that "a parent or guardian may not be subjected to criminal liability for the use of force against a minor child under the care and supervision of the parent or guardian, provided that (1) the force used against the minor child is reasonable; (2) the force is reasonably related to the purpose of safeguarding or promoting the welfare of the minor, including the prevention or punishment of the minor's misconduct; and (3) the force used neither causes, nor creates a substantial risk of causing, physical harm (beyond fleeting pain or minor, transient marks), gross degradation, or severe mental distress." Commonwealth v. Dorvil, 472 Mass. 1, 12 (2015). This holding was based, in part, on an awareness that "a privilege to use reasonable force in disciplining a minor child has long been recognized at common law." Id. at 8.

is rationally related to the department's objectives in the placement of foster children. See generally Anusavice v. Board of Registration in Dentistry, 451 Mass. 786, 795 (2008) (where board's policy "is not contrary to the language of its enabling statute, and is rationally related to furthering the board's purpose to safeguard the public health and welfare, it will be upheld"); Arthurs v. Board of Registration in Med., 383 Mass. 299, 312-313 (1981) ("It is a recognized principle of administrative law that an agency may adopt policies through adjudication as well as through rulemaking"). As such, the department's decision to deny the Magazus' application to become foster parents did not exceed the department's authority, is not arbitrary or capricious, and is supported by substantial evidence. Accordingly, the Magazus are not entitled to relief under G. L. c. 30A, § 14 (7) (b), (c), (e), or (g).

5. Right to relief under G. L. c. 30A, § 14 (7) (a), for violation of constitutional provisions. The Magazus assert that, in accordance with their sincerely held Christian beliefs, they use appropriate corporal punishment on their own two daughters as a matter of loving parenting and biblical understanding. They contend that the department's denial of their application to become foster parents substantially burdens their right to the free exercise of religion under art. 46, § 1, of the Amendments to the Massachusetts Constitution, amending

art. 18 of the Amendments, and that the department has failed to demonstrate a sufficiently compelling State interest to justify this burden. Therefore, the Magazus continue, because the department's decision impermissibly infringes on their constitutional right, their application to become foster parents should be allowed. We disagree.

Article 46, § 1, of the Amendments provides, "No law shall be passed prohibiting the free exercise of religion," and parallels the First Amendment to the United States Constitution, which states, "Congress shall make no law . . . prohibiting the free exercise [of religion] . . . ."[9] See Commonwealth v. Nissenbaum, 404 Mass. 575, 578 & n.3 (1989). Notwithstanding the similarity between these two constitutional provisions, "the scope of protection afforded the right to freely exercise one's religion under the Massachusetts Constitution is greater than that afforded by the United States Constitution." Rasheed v. Commissioner of Correction, 446 Mass. 463, 467 (2006). We

---

[9] The right to freely exercise one's religion also is embodied in art. 2 of the Massachusetts Declaration of Rights, which ensures that no person "shall be hurt, molested, or restrained, in his person, liberty, or estate, for worshipping GOD in the manner and season most agreeable to the dictates of his own conscience; or for his religious profession or sentiments; provided he doth not disturb the public peace, or obstruct others in their religious worship." See Rasheed v. Commissioner of Correction, 446 Mass. 463, 466 (2006). In the present appeal, the Magazus' free exercise claim focuses on the purported violation of art. 46, § 1, of the Amendments to the Massachusetts Constitution, amending art. 18 of the Amendments.

assess a claim that the Commonwealth has impermissibly burdened the free exercise of religion in violation of art. 46, § 1, of the Amendments by using the balancing test articulated in Desilets, 418 Mass. at 321-323.[10]  See Rasheed, supra; Society of Jesus of New England v. Commonwealth, 441 Mass. 662, 669-670 (2004).

This balancing test requires that we determine whether the State action about which a party has complained (here, a

---

[10] In Desilets, 418 Mass. at 321, this court stated that it "should reach its own conclusions on the scope of the protections of art. 46, § 1, [of the Amendments] and should not necessarily follow the reasoning adopted by the Supreme Court of the United States under the First Amendment."  This pronouncement arose as a consequence of the Supreme Court's decision in Employment Div., Dep't of Human Resources of Or. v. Smith, 494 U.S. 872 (1990), "a much criticized opinion that weakened First Amendment protections for religious conduct." Desilets, supra.  See Abdul-Alázim v. Superintendent, Mass. Correctional Inst., Cedar Junction, 56 Mass. App. Ct. 449, 453-454 & n.8 (2002).  Prior to Smith, the Supreme Court had employed a balancing test to analyze free exercise claims under the First Amendment, requiring a State to identify a compelling interest that would outweigh the burden on the free exercise of religion.  See Wisconsin v. Yoder, 406 U.S. 205, 214-215 (1972); Sherbert v. Verner, 374 U.S. 398, 403-409 (1963).  See also Society of Jesus of New England v. Commonwealth, 441 Mass. 662, 669 n.7 (2004).  In Smith, supra at 878, the Supreme Court rejected this approach, holding that if the burden on free exercise is "merely the incidental effect of a generally applicable and otherwise valid provision, the First Amendment has not been offended."  See Society of Jesus of New England, supra.  We subsequently stated in Desilets, supra at 321-322, that when interpreting art. 46, § 1, of the Amendments, Massachusetts courts would adhere to the standards of First Amendment jurisprudence that predated Smith, and would continue to use the compelling State interest balancing test for claims alleging an impermissible burden on the free exercise of religion.

prohibition on the use of corporal punishment in a foster home) "substantially burdens [the] free exercise of religion, and, if it does, whether the Commonwealth has shown that it has an interest sufficiently compelling to justify that burden." Desilets, 418 Mass. at 322. See Alberts v. Devine, 395 Mass. 59, 73-74, cert. denied sub nom. Carroll v. Alberts, 474 U.S. 1013 (1985); Attorney Gen. v. Bailey, 386 Mass. 367, 375, cert. denied sub nom. Bailey v. Bellotti, 459 U.S. 970 (1982). See also Yoder, 406 U.S. at 215 ("only those interests of the highest order and those not otherwise served can overbalance legitimate claims to the free exercise of religion"); Sherbert v. Verner, 374 U.S. 398, 403-409 (1963). More specifically, the party claiming an unconstitutional burden on the free exercise of religion "must show (1) a sincerely held religious belief, which (2) conflicts with, and thus is burdened by, the [S]tate requirement. Once the claimant has made that showing, the burden shifts to the [S]tate. The [S]tate can prevail only by demonstrating both that (3) the requirement pursues an unusually important governmental goal, and that (4) an exemption would substantially hinder the fulfillment of the goal" (footnotes omitted). Desilets, supra at 322-323, quoting L.H. Tribe, American Constitutional Law § 14-12, at 1242 (2d ed. 1988). See Rasheed, 446 Mass. at 467, 472. "[T]he State's assertion of a compelling interest, and the balancing of that interest against

the burden imposed on the exercise of religion, is considered in a concrete, pragmatic, and fact-specific way." Society of Jesus of New England, 441 Mass. at 671.

As an initial matter, the Magazus suggest that the department, through its regulations and policies, has impermissibly infringed on the Magazus' religious beliefs, not their conduct. We disagree with this characterization of the department's purported constitutional infringement. The free exercise of religion "embraces two separate concepts, 'freedom to believe and freedom to act.'" Bailey, 386 Mass. at 375, quoting Cantwell v. Connecticut, 310 U.S. 296, 303 (1940). See note 9, supra. "Religious beliefs -- what a person thinks, what faith he holds in his heart and mind -- are indeed protected absolutely" from governmental interference. Society of Jesus of New England, 441 Mass. at 676. See Sherbert, 374 U.S. at 402 ("The door of the Free Exercise Clause stands tightly closed against any governmental regulation of religious beliefs as such" [emphasis in original]); Murphy v. I.S.K.Con. of New England, Inc., 409 Mass. 842, 851, cert. denied, 502 U.S. 865 (1991). "Conduct in furtherance of those beliefs, however, is the 'exercise' of religion, and government infringements on religiously inspired conduct are permissible if they satisfy the compelling State interest balancing test." Society of Jesus of New England, supra. See Yoder, 406 U.S. at 220 ("activities of

individuals, even when religiously based, are often subject to regulation by the States in the exercise of their undoubted power to promote the health, safety, and general welfare"); Alberts, 395 Mass. at 73 (freedom to act on religious beliefs subject to regulation for societal protection). Contrary to the Magazus' suggestion, this case is not about their freedom to believe particular religious tenets, including those pertaining to the raising and disciplining of children. Rather, these proceedings are about specific conduct -- corporal punishment -- that is and would continue to be used in the Magazus' home even if they became foster parents. To the extent that the department may have infringed on the Magazus' constitutional rights, such infringement is on their freedom to act, not on their freedom to believe. We turn now to consideration of the balancing test articulated in Desilets.

The department has not challenged the Magazus' contention that their use of corporal punishment is based on their sincerely held religious beliefs. Therefore, in order to succeed on their claim, the Magazus must establish that the department's prohibition against the use of corporal punishment in a foster home constitutes a "substantial burden" on their exercise of those beliefs. Curtis v. School Comm. of Falmouth, 420 Mass. 749, 761 (1995), cert. denied, 516 U.S. 1067 (1996), quoting Hernandez v. Commissioner of Internal Revenue, 490 U.S.

680, 699 (1989). See Rasheed, 446 Mass. at 472; Desilets, 418 Mass. at 322. "[A] 'substantial burden' is one that is coercive or compulsory in nature." Curtis, supra. "[I]ncidental effects of government programs, which may make it more difficult to practice certain religions but which have no tendency to coerce individuals into acting contrary to their religious beliefs, [do not] require government to bring forward a compelling justification for its otherwise lawful actions." Id. at 762, quoting Lyng v. Northwest Indian Cemetery Protective Ass'n, 485 U.S. 439, 450-451 (1988).

Here, because the department's prohibition against the use of corporal punishment in a foster home is inherently incompatible with the Magazus' religious beliefs, the Magazus are compelled to make a choice. On the one hand, they can adhere to the teachings of their religion and use corporal punishment as a form of discipline in their home, thereby forfeiting the opportunity to become foster parents. On the other hand, they can abandon this particular religious tenet in the hope of being approved as foster parents. We conclude that, by conditioning the Magazus' opportunity to become foster parents on their willingness to forsake a sincerely held religious belief, the department has substantially burdened the Magazus' constitutional right under art. 46, § 1, of the Amendments to the free exercise of religion. See, e.g.,

Rasheed, 446 Mass. at 474 (prohibiting prison inmate from acquiring Islamic festival meats that inmate believed he must consume to comply with faith constituted substantial burden on free exercise of religion). That being the case, we proceed to consider whether the department has demonstrated a sufficiently compelling interest to justify this burden. See Desilets, 418 Mass. at 322, and cases cited.

"It cannot be disputed that the State has a compelling interest to protect children from actual or potential harm." Blixt, 437 Mass. at 656. This is especially true with respect to foster children whose need for safety, security, and stability is readily apparent. See generally Petition of the Dep't of Pub. Welfare to Dispense with Consent to Adoption, 383 Mass. 573, 587-588 (1981), quoting Richards v. Forrest, 278 Mass. 547, 553 (1932) ("The State as parens patriae may act to protect minor children from serious physical or emotional harm. . . . In such matters 'the first and paramount duty of courts is to consult the welfare of the child. To that governing principle every other public and private consideration must yield'"). Consistent with this compelling State interest, the department has determined that a foster child should not be placed in a home where corporal punishment is used as a disciplinary measure. Creating an exception to this policy for individuals like the Magazus who employ physical discipline in

conformity with their religious beliefs would severely undermine the department's substantial interest in protecting the physical and emotional well-being of children whose welfare has been entrusted to the department's care.  Moreover, expecting the department to place with the Magazus children who have <u>not</u> suffered neglect or abuse is neither realistic nor feasible given the type of children served by the department and the potential dearth of information concerning the precise nature and scope of their prior trauma.  Based on the department's compelling interest in protecting the welfare of foster children, we conclude that its prohibition against the use of corporal punishment in a foster home outweighs the burden on the Magazus' right to employ physical discipline in accordance with their religious beliefs.  Accordingly, the Magazus are not entitled to relief under G. L. c. 30A, § 14 (7) (<u>a</u>).

6.  <u>Conclusion</u>.  The judgment of the Superior Court dismissing the Magazus' appeal from the final decision of the department is affirmed.

<u>So ordered</u>.

CORDY, J. (concurring, with whom Botsford and Duffly, JJ., join). I concur in the court's conclusion that the Department of Children and Families (department) has a compelling interest in protecting the physical and emotional well-being of foster children, and that it could reasonably interpret its enabling legislation to deny an application to become foster and preadoptive parents because of the applicants' use of physical discipline as a form of disciplining their own children. I write separately to question the uniformity of the department's application of its standards for assessing the suitability of foster parents and their licensing across the department's western region, and the consistency of the rigor it applied to the plaintiffs' application compared to the applications of others who posed significant risks to the compelling interests the department is charged with protecting.[1]

I begin with several propositions that I expect would be beyond dispute. First, the department's filings for custody have been significantly increasing, some would say "soaring,"

---

[1] In its 2015 annual report, the Office of the Child Advocate reported that on the basis of its reviews of G. L. c. 119, § 51A, neglect and abuse reports filed with, investigated, and supported by the Department of Children and Families (department) in the prior year, its staff had found "concerning trends" within foster homes and regarding the selection of certain foster homes. Of the § 51A reports it reviewed, more than sixty per cent involved children in foster homes. See Office of the Child Advocate, Annual Report: Fiscal Year 2015, at 9-10.

over the last several years.[2]  Second, the department is in dire

need of qualified foster parents and homes to care for this

burgeoning population of children who have been removed from the

custody of their parents because of severe abuse and neglect.

Third, the challenges facing foster parents can be as daunting

as their role is important, and the department must provide them

both an appropriate level of oversight and support to ensure the

successful transition of the children in their care.

Turning to the plaintiffs and their interest in providing a

safe, caring, and nurturing environment to this particularly

vulnerable population, it is apparent from the record that in

every respect (but for one) they were ideal foster and

preadoptive candidates.  They had a very stable home

environment, a nurturing supportive relationship with their own

two children, and an excellent record of employment and

community involvement.  The department's file reveals that it

conducted an indepth and thorough inquiry into and review of the

plaintiffs' personal and family experiences and upbringing, as

well as their home life.  The plaintiffs cooperated fully and

candidly in detailing their experiences, their reasons for

---

[2]In June, 2014, the Boston Globe reported that from December 2013, through May, 2014, the department had filed 2,000 court petitions to gain custody of children it determined to be at risk of abuse or neglect, a fifty-two per cent increase from the previous year.  It further reported that in May, 2014, the department filed 265 petitions, a seventy per cent jump from May, 2013.  See P. Schworm, State Filings for Custody of Children Soaring, Boston Globe, June 20, 2014, at A.1.

wanting to serve as foster parents, and the relationship with their two children.

In the end, the only flaw latched onto by the department was the plaintiffs' explanation that their deeply held Christian religious beliefs included the use of physical discipline (albeit sparingly applied) in the upbringing of their children. This honest revelation led to further intense inquiry as to whether such punishment would be used on children placed into their care by the department, which would be contrary to its explicit regulation against the use of such discipline on foster children. The plaintiffs advised the department that they fully understood this limitation and would comply with the regulation and the required written contract provisions that would govern their relationship.

The department conceded that there was no reason for the department to doubt the sincerity of the plaintiffs, but wanted additional assurances (beyond what was required in its regulations and its contract) that the plaintiffs would not physically discipline their own children during periods when they had foster children in their care. The plaintiffs could not agree to this condition because of their religious views, but advised that they did not physically discipline either of their children in the presence of the other and would not do so in the presence of the foster children in their care. This

apparently was not good enough, and the department found that the plaintiffs did not meet the department's licensing standards because they physically disciplined their own children.

While the department's position might, when balanced against all of the positives the plaintiffs possessed, seem overly rigid and cautious in the extreme, the department's responsibility to children already exposed to abuse or neglect is very substantial. That heightened responsibility could justify the department's declining a family setting in which such a child might feel insecure or unsafe or traumatized if they become aware that physical discipline was being meted out to other children.

One is left to wonder, however, whether the real problem in this case was not so much the department's concern for child safety, but rather a disagreement with the plaintiff's beliefs regarding the upbringing of their children. While we have no other licensing investigation files in the record before us, it is hard to ignore the highly public tragedies of the last two years regarding children under the supervision of the department in foster homes, and not to question whether the high standards and intensive assessment and scrutiny applied to the plaintiffs is the exception rather than the norm, particularly in the western region.

Fuel for this concern comes most recently in an official investigative report of the death and near death of two foster children placed in the foster home of a woman, also located in the western region.[3] The death and injury were due to severe neglect. The investigative report of the case is revealing in many respects, but most particularly in its description of the licensing investigation, and its inadequacies, that led to the licensure of the woman as a foster parent shortly after the plaintiffs' application was denied. According to the report, the applicant was an unmarried woman with medical issues, who was supported by Supplemental Security Income disability payments, and who had two children who no longer had contact with their father, as well as an adopted third child. At least one of these children also had serious medical issues, and during the licensing investigation the doctor for the woman's children advised that she was already overwhelmed by managing her own children's medical needs. In addition, G. L. c. 119, § 51A, reports of abuse and neglect had been filed against her;[4]

---

[3] See generally, "Case Review: The Foster Home of Kimberly Malpass, September 30, 2015," prepared by the Executive Office of Health and Human Services, Department of Children and Families.

[4] One of these reports, filed in June of 2012 (before she was licensed), alleged neglect of her three children and that one or more of her children had been beaten with a belt by her boy friend. After the woman was licensed, and six months prior to the death of one of the foster children placed in her care, the department received another report that the woman's boy

the school attended by one of her children reported that the child was chronically absent, and was out of control; and it was known that there was a family history of neglect. Further, the licensing investigation did not include a routine check with the local police, which would have revealed that the police had been called at least twenty-five times in response to problems at her home. Regardless, the woman was licensed by the department, and at the time of the tragedy, she had three children assigned to her care by the department (in addition to her other three children).[5]

Whether the department's process and standards resulting in the licensing of this foster mother is the norm or the exception, we do not know. Hopefully, it is the exception and, whatever the licensing standard actually is, it will be uniformly applied.

---

friend had been living in the home (unreported), was a drug user, was a "disciplinarian in the home and [had] hit [one of the foster children] in the head . . . when [the foster child] was not listening." Although it was apparent that she likely was not truthful in the subsequent "investigation," at least with respect to her relationship with her boy friend and their living arrangements, no action was taken except that it was "emphasized" to her that "all frequent visitors needed to be approved by [the department]."

[5] Foster parents receive a daily financial stipend from the department for each child in their care, plus allowances for clothing, birthdays, and holidays.