SUPREME JUDICIAL COURT 
 
 CARE AND PROTECTION OF EVE.[1]

 
 Docket:
 SJC-13672
 
 
 Dates:
 February 7, 2025 - May 15, 2025
 
 
 Present:
 Budd, C.J., Gaziano, Kafker, Wendlandt, Georges, & Wolohojian, JJ.
 
 
 County:
 Norfolk
 

 
 Keywords:
 Department of Children & Families. Religion. Public Health, Immunization. Constitutional Law, Parent and child, Freedom of religion. Parent and Child, Care and protection of minor, Custody, Interference with parental rights. Interference with Parental Rights. Due Process of Law, Care and protection of minor. Minor, Care and protection, Custody. Practice, Civil, Care and protection proceeding.
 
 

  
      Petition filed in the Norfolk County Division of the Juvenile Court Department on May 9, 2023.
      A motion to allow vaccinations was heard by Joseph F. Johnston, J.
      A proceeding for interlocutory review was heard in the Appeals Court by Joseph M. Ditkoff, J.  The Supreme Judicial Court granted an application for direct appellate review.
      Kylah I. Clay for the mother.
      Laura E. Openshaw for the father.
      Kristin S. Braithwaite for Department of Children and Families.
      Jeanne M. Kaiser for the child.
      Samuel J. Whiting, for Massachusetts Family Institute, Inc., amicus curiae, submitted a brief.
      KAFKER, J.  A child was temporarily removed from her parents' care shortly after her birth and placed in the custody of the Department of Children and Families (department) due to concerns about domestic violence.  The department sought to vaccinate her in accordance with an age-based immunization schedule, but her parents, practicing Rastafarians, objected on religious grounds and sought to bar the department from having the child vaccinated.  Ultimately, a Juvenile Court judge allowed the department to facilitate vaccinations for the child.
      The parents seek to stop the child from receiving any future vaccinations while in the department's temporary custody.  The parents argue that the vaccination of their child over their religious objections, when they have only temporarily lost custody, violates their constitutional rights.  The parents rely on a State statute allowing religious exemptions to vaccine requirements for school-aged children as evidence that parents who retain custody of their children are not generally required to have the children vaccinated if so doing would violate their religious beliefs.  See G. L. c. 76, § 15.  They also point to inconsistent treatment by the department, which has not vaccinated any of their three other children, who were previously removed from their care and placed in the now permanent custody of the department.
      Applying the State constitutional protections afforded parents exercising their free exercise rights, we conclude that the order allowing the child to be vaccinated violated those rights.  Where the exercise of the parents' sincerely held religious beliefs is substantially burdened by the department's vaccination efforts, the department must have "an important governmental interest that is sufficiently compelling that the granting of an exemption to people in the position of the [parents] would unduly hinder that goal."  Attorney Gen. v. Desilets, 418 Mass. 316, 325 (1994).  This test is applied in "a concrete, pragmatic, and fact-specific way."  Society of Jesus of New England v. Commonwealth, 441 Mass. 662, 671, S.C., 442 Mass. 1049 (2004) (Society of Jesus).  It also considers whether the law or its application is "tailored narrowly" to the important government interest sought to be protected.  Desilets, supra at 321 n.4.  We hold that the department failed to demonstrate that exempting this child from vaccinations would "substantially hinder" the fulfillment of the department's interests in promoting child health.  The Commonwealth's allowance of religious exemptions from vaccination requirements for parents who have not lost custody and the department's inconsistent exercise of its authority to order vaccinations for children in its care are determinative.[2]  
      1.  Factual and procedural background.  The child was born to the mother and father on January 1, 2024.  The child's three older siblings had previously been removed from the mother and father's care and placed in the custody of the department at the ages of eleven months old, two years old, and four years old because of concerns about domestic violence.  The parents stipulated to their unfitness as to the child's three siblings.  The three siblings are now in the permanent custody of the department and reside with their mother's aunt.  The department has not ordered any vaccinations for any of the child's three siblings while in its care.
      Nine days before the child was born, the father punched through the window of the room in the shelter in which he and the mother were staying.  Four days later, the police were called to respond to an incident in the parents' room of the shelter.  An administrator at the hotel out of which the shelter operated heard a man angrily yelling and, subsequently, a woman crying.  The couple refused to open the door to their room to allow the security guard to do a wellness check, and the father yelled obscenities through the door at the security guard.  The police arrived shortly thereafter and ultimately convinced the father to open the door so that an officer could speak with him and the mother to verify that everyone in the room was okay.
      a.  Removal.  In light of the concerns about ongoing domestic violence between the mother and father, the department was granted emergency custody of the child two days after she was born, following an emergency custody hearing.  On January 5, 2024, the parents brought a joint motion to stay vaccination of the child until the temporary custody hearing on January 10.  The department agreed not to pursue any vaccinations prior to the custody hearing.[3]  
      b.  Temporary custody hearing.  At the temporary custody hearing, both parents testified to their religious beliefs and objections to Western medicine.  The parents are Rastafarians.  As part of their religious practice, they avoid Western medicine, including vaccines, and take a holistic approach to healing illness.  For example, the father testified that they would use herbs if a child had a headache and give elderberries and a bath to a child with a high fever.  The parents elect to use Western medicine as a "last resort" when it is a question of "basically life or death."  In the parents' view, "you're not supposed to put anything inside your body outside of what nature has already given you because it goes against God's plan."  More specifically, the mother testified that at the hospital after the child was born, she consented to have the child's blood drawn to test her glucose levels and consented to giving the child formula because the child could not have breast milk, but she did not consent to giving the child vitamin K drops because that was "a choice."   
      As to the child's three older siblings, the mother testified that she declined early intervention recommended by a pediatrician for one of them because "it was optional."  The mother also testified that if she had custody of the child's siblings, she would not "intend to have them vaccinated" and that none of the three other children had been vaccinated since being placed in the care of the department.  After the three older children were removed from her care, one had to be hospitalized for three days with a high fever and breathing issues, for which the mother had not sought medical care.  Finally, the mother also disclaimed most of her prior domestic violence allegations against the father. 
      At the conclusion of the temporary custody hearing, the judge found that the department had sustained its burden of showing by a fair preponderance of the evidence that the child was at immediate risk of abuse or neglect and the judge expressed concern about the parents' history of domestic violence and medical neglect.  Accordingly, the judge granted the department temporary custody of the child but allowed the parents' motion to enjoin vaccinations "at this time."
      c.  Joint motion to vaccinate.  Subsequently, the department and the child jointly moved to allow the department to arrange for vaccinations of the child pursuant to a standard immunization schedule.  In support, the department submitted an affidavit signed by two physicians treating the child.  The affidavit stated that "[a] standard platform of vaccines for infants and children in the United States is recommended by the American Academy of Pediatrics and by the Centers for Disease Control and Prevention."  It further provided that "[f]ailure to administer vaccines on the recommended schedule exposes infants and children to an unacceptable level of risk for life-threatening preventable illnesses that can cause severe disease or death."  The parents objected on religious grounds. 
      The judge held a hearing on the joint motion, which the parties had agreed would be heard at 2 P.M.  On the day of the hearing, the judge rescheduled the hearing for 10 A.M., but counsel for the mother and counsel for the father were unable to reach their clients to inform them of the time change.  Accordingly, counsel for the mother and counsel for the father moved to continue the hearing so that their clients would have the opportunity to testify as to their religious beliefs.  The judge, who had presided over the temporary custody hearing, denied the motion to continue.  At the hearing, the department argued that the vaccinations were medically necessary and within the department's authority and that the parents' objections should be balanced against the interests of the child and the Commonwealth.  Both counsel for the child and counsel for the department questioned the sincerity of the parents' religious beliefs and argued that vaccination served the child's best interests.  Counsel for the mother and counsel for the father, on the other hand, argued that deciding such a question based on the best interests of the child would effectively nullify religious exemptions, given the consensus of the medical establishment in favor of vaccinations.  The judge was also informed that the three other children in the department's custody had not been vaccinated.
      After the hearing, the judge issued an oral order that "not[ed] . . . the parents' inconsistencies in their statements regarding vaccination, but assum[ed] arguendo that [the parents were] asserting a valid religious belief" and found that the parents' religious beliefs were nevertheless "outweighed by the child's best interest."  In so finding, the judge credited the doctors' affidavit on the medical necessity of vaccinating the child.
      d.  Further motion practice.  The parents jointly filed a petition with the single justice of the Appeals Court challenging the judge's order, and the single justice referred the matter to a panel of the Appeals Court.  The parents filed a motion in the Juvenile Court to stay any vaccinations pending the outcome of the appeal, which the judge denied.  The parents jointly petitioned the single justice for interlocutory relief from the order of the judge.  The single justice denied the petition on the ground that the parents failed to show a likelihood of success on the merits.  The parents then appealed from that ruling to the Appeals Court panel.  The child sought direct appellate review in this court, which we allowed.
      In the meantime, the child has received several vaccinations, and the department plans to continue vaccinating the child according to the recommended immunization schedule.  The department, which now has permanent custody of the child's three older siblings, has not vaccinated any of the child's siblings.   
      2.  Discussion.  No party disputes that the department has the authority to provide for the routine medical care of children in its custody, which includes vaccinations.  See G. L. c. 119, § 21 (defining "custody" to include "the power to . . . determine a child's . . . medical care"); 110 Code Mass. Regs. § 11.01 (2022); 110 Code Mass. Regs. § 11.04(1)(k) (2022).  The question presented in this case is whether the department may vaccinate a child temporarily in its custody consistent with the position advocated by the child's counsel but against the religious objections of the child's parents.  
      This is a matter of first impression for this court.  We have previously held that that the department may authorize extraordinary medical care over parental objections on religious grounds when the child is unlikely to survive without the treatment.  See Matter of McCauley, 409 Mass. 134, 136 (1991) (McCauley).  We have not, however, had cause to evaluate the Commonwealth's authority to pursue routine medical care for a child temporarily in its custody that violates the religious beliefs of the child's parents.          
      a.  State childhood vaccination policy.  We begin with the State childhood vaccination policy and the religious exemptions it allows.  Massachusetts mandates that children attending school, school-based daycare programs, and recreational camps receive certain enumerated vaccinations.  See G. L. c. 76, § 15; 105 Code Mass. Regs. § 220.500(A) (2016); 105 Code Mass. Regs. § 430.152 (2024).  However, "[i]n the absence of an emergency or epidemic of disease . . . no child whose parent or guardian states in writing that vaccination or immunization conflicts with his sincere religious beliefs shall be required to present [a vaccination] certificate in order to be admitted to school."  G. L. c. 76, § 15.  See 105 Code Mass. Regs. § 220.500(C)(1) (vaccination requirements shall not apply where "the student's parent or guardian if the student is a minor . . . provides written documentation that he or she meets the standards for . . . religious exemption set forth in [G. L.] c. 76, § 15"); 105 Code Mass. Regs. § 430.153(A), (C) (2024) (unless cases of communicable diseases are present in camp, "[i]f a camper . . . has religious objections to . . . immunizations, the camper . . . shall submit a written statement, signed by a parent or legal guardian . . . stating that the individual is in good health and stating the general reason for such objections").
      b.  Departmental authority.  We next turn to the statutes and regulations governing care and protection proceedings and medical care for children involved in such proceedings.  General Laws c. 119 provides the statutory framework for care and protection proceedings.  The department may be granted temporary custody of a child following a temporary custody hearing pursuant to G. L. c. 119, § 24, fourth par.  Section 21 defines "custody" to include, inter alia, the power to "determine a child's place of abode, medical care and education."  G. L. c. 119, § 21.  "[M]edical care" is divided into three categories in department regulations:  routine, emergency, and extraordinary.  See 110 Code Mass. Regs. § 11.01.  The department is authorized to consent to "routine medical care" for a child in its custody, which is defined to include "[i]mmunization against . . . tetanus, measles, poliomyelitis, mumps, rubella and such other communicable diseases as may be specified from time to time by the Department of Public Health."  110 Code Mass. Regs. §§ 11.01, 11.04(1)(k), 11.04(2).
      "Custody" is not defined to include any authority to direct the child's religious upbringing or affiliation.  Nor does the statute provide any carveout from the custodial powers defined in § 21 for the religious objections of parents.  Section 21 provides, generally, that "[i]f a parent or guardian objects to the carrying out of any power conferred by this paragraph [enumerating custodial powers], that parent or guardian may take application to the committing court and the court shall review and make an order on the matter."  G. L. c. 119, § 21.
      c.  Constitutional exemption.  The parents argue that even absent a statutory exemption from the department's custodial power provided by § 21, they have constitutionally protected rights to override the department's medical care decision on religious grounds.  Specifically, they argue that they have "residual rights" to direct their child's religious upbringing despite their temporary loss of custody and that the vaccination of their child over their religious objections violates their rights as guaranteed by the State and Federal Constitutions.  We agree for the reasons discussed infra.
      i.  Parents' constitutional rights.  There is no question that the rights to freely practice one's religion and to raise children "according to the dictates of [one's] own conscience" are among the most "sacred private interests," long recognized as such by this court and the United States Supreme Court.  Meyer v. Nebraska, 262 U.S. 390, 399 (1923).  Prince v. Massachusetts, 321 U.S. 158, 165 (1944).  See Care & Protection of Jamison, 467 Mass. 269, 282 (2014), quoting Stanley v. Illinois, 405 U.S. 645, 651 (1972) ("Such parental rights have been described as being among the 'essential' and 'basic civil rights of man'").  The right to direct the religious upbringing of one's child is located both in the free exercise clause of the First Amendment and the due process clause of the Fourteenth Amendment to the United States Constitution.[4]  See Troxel v. Granville, 530 U.S. 57, 65 (2000) ("The liberty interest at issue in this case -- the interest of parents in the care, custody, and control of their children -- is perhaps the oldest of the fundamental liberty interests recognized by this Court"); Prince, supra (recognizing rights "of parents to give [children] religious training and to encourage them in the practice of religious belief, as against preponderant sentiment and assertion of state power voicing it"); McCauley, 409 Mass. at 137 ("The right to the free exercise of religion, including the interests of parents in the religious upbringing of their children is, of course, a fundamental right protected by the Constitution"); Felton v. Felton, 383 Mass. 232, 233 (1981) ("The parents together have freedom of religious expression and practice which enters into their liberty to manage the familial relationships"); Custody of a Minor, 375 Mass. 733, 748 (1978) (parents "have the primary right to raise their children according to the dictates of their own consciences").
      The Supreme Court has also emphasized that the "parent's conflict with the state over control of the child and his training is serious enough when only secular matters are concerned.  It becomes the more so when an element of religious conviction enters."  Prince, 321 U.S. at 165.  See Wisconsin v. Yoder, 406 U.S. 205, 233 (1972) (stressing importance of parental rights "when linked to a free exercise claim"). 
      Cognate provisions of our State Constitution likewise provide express and vital protections for these fundamental rights.  Article 12 of the Massachusetts Declaration of Rights protects the "fundamental right of parents to make decisions concerning the care, custody, and control of their children."  Care & Protection of Jaylen, 493 Mass. 798, 807 (2024), quoting Troxel, 530 U.S. at 66.  And "[art.] 46, § 1, of the Amendments to the Massachusetts Constitution (in language similar to that contained in the First Amendment to the United States Constitution) . . . provides that '[n]o law shall be passed prohibiting the free exercise of religion.'"  Rasheed v. Commissioner of Correction, 446 Mass. 463, 466 (2006).  Indeed, we have identified circumstances where the "the scope of protection afforded the right to freely exercise one's religion under the Massachusetts Constitution is greater than that afforded by the United States Constitution."  Magazu v. Department of Children & Families, 473 Mass. 430, 442 (2016), quoting Rasheed, supra at 467.  More specifically, we have concluded that the State Constitution provides greater protection than that provided under the Federal Constitution with respect to the distinction drawn by the Supreme Court in Employment Div., Dep't of Human Resources of Or. v. Smith, 494 U.S. 872 (1990).  As we explained in Desilets: 
"The Supreme Court [held in] the Smith case that 'a law that is neutral and of general applicability need not be justified by a compelling governmental interest even if the law has the incidental effect of burdening a particular religious practice.'  Church of the Lukumi Babalu Aye, Inc. v. Hialeah, [508 U.S. 520, 531] (1993).  Where, however, a law burdening religious practice is not neutral or is not of general application, [under the Federal Constitution,] that law must advance compelling interests and must be tailored narrowly in pursuit of those interests.  Id. at [546]."
Desilets, 418 Mass. at 321 n.4.  As we noted, "[b]ecause this latter test states the standard that we apply under the State Constitution in all circumstances where a law burdens religion, we need not decide whether the law challenged in this case is neutral and of general applicability."  Id.
      Although the rights at issue are protected under both the Federal and State Constitutions, such rights are not absolute under either Constitution.  "It is cardinal with us that the custody, care and nurture of the child reside first in the parents," but "neither rights of religion nor rights of parenthood are beyond limitation."  Prince, 321 U.S. at 166.  Indeed, "[a]cting to guard the general interest in youth's well[-]being, the state as parens patriae may restrict the parent's control . . . .  Its authority is not nullified merely because the parent grounds his claim to control the child's course of conduct on religion or conscience."  Id.  See Yoder, 406 U.S. at 233-234 ("the power of the parent, even when linked to a free exercise claim, may be subject to limitation . . . if it appears that parental decisions will jeopardize the health or safety of the child, or have a potential for significant social burdens").  Most relevant to the facts before us, "these fundamental principles do not warrant the view that parents have an absolute right to refuse medical treatment for their children on religious grounds."  McCauley, 409 Mass. at 137. 
      Further complicating the constitutional rights analysis here is the parents' temporary loss of custody.  Although the parents have, at least for a period of time, lost control over the ordinary day-to-day decisions parents make regarding the upbringing of their children, see G. L. c. 119, § 21, they have not lost their constitutional rights.  As the Supreme Court has explained, "[t]he fundamental liberty interest of natural parents in the care, custody, and management of their child does not evaporate simply because they have not been model parents or have lost temporary custody of their child to the State."  Santosky v. Kramer, 455 U.S. 745, 753 (1982).  
      A temporary loss of custody is just that.  It is based on a temporary custody hearing at which the department need only prove that the child was in immediate danger of serious abuse or neglect by a "fair preponderance of the evidence" (citation omitted).  Care & Protection of Robert, 408 Mass. 52, 68 (1990).  Although the misconduct here is most concerning, and the parents have stipulated to their unfitness in regard to their three other children, the parents have not been found unfit to parent this child by clear and convincing evidence, nor has there been any attempt to terminate their parental rights for this child at this stage.  Unless and until the court finds otherwise, reunification remains the goal.  See G. L. c. 119, § 29C (requiring department to make "reasonable efforts to make it possible for the child to return safely to his parent or guardian"); 110 Code Mass. Regs. § 1.02(4) (2008) ("the [d]epartment shall . . . recognize that substitute care is a temporary solution, and require the [d]epartment and the parent[s] to direct their efforts toward reunification of child[ren] and parent[s]"); Care & Protection of Rashida, 488 Mass. 217, 219-221 (2021).  
      Although the Commonwealth has assumed control over certain decision-making concerning the child, at least temporarily, that assumption of control does not extend to the religious upbringing of the child.  In this area in particular, the Commonwealth must not overstep its bounds.  See First Amendment to the United States Constitution; art. 46, § 1, of the Amendments to the Massachusetts Constitution; 110 Code Mass. Regs. § 4.40(5) (2023) ("The Department, including foster parents, may not procure or authorize any religious ceremony for any minor child in its custody, absent authorization from the child's parent[s] or order of the court").  We are aware of no case extinguishing parental free exercise rights in this context.  As we explained, albeit in dictum, in Custody of a Minor, 377 Mass. 876, 884 n.7 (1979), parents retain "residual rights," which include the right "to determine the child's religious affiliation."  See Diana H. v. Rubin, 217 Ariz. 131, 134-135 (Ct. App. 2007) (holding that State cannot vaccinate child over religious objections of mother where statute explicitly states agency's care of children in temporary custody is "subject to . . . residual parental rights" and court interpreted "residual rights" to "encompass[] a parent's right to determine the religious upbringing of his or her child").  Although this is dictum, and the provision cited for this proposition, G. L. c. 119, § 33, mandates only that when placing a child in foster care, the department "shall consider all factors relevant to the child's . . . moral health," we conclude that this proposition is also correct as a matter of constitutional law.[5]  See art. 12 of the Massachusetts Declaration of Rights; art. 46, § 1, of the Amendments to the Massachusetts Constitution.  See generally Santosky, 455 U.S. at 753.
      In sum, parents retain residual constitutional rights regarding the religious upbringing of their child, notwithstanding the temporary loss of custody of that child, which includes the temporary loss of control of many of the day-to-day decisions that are typically the province of parents.  See G. L. c. 119, § 21.  All of this brings us to the question we must decide in the instant case:  when parents who have temporarily lost custody object to their child receiving vaccinations on religious grounds, and the department and the child insist that such vaccinations are necessary, do the parents' residual constitutional rights to direct their child's religious upbringing supersede the statutory authority of the department to make routine medical decisions for the child in its temporary custody?[6]
      ii.  State constitutional standard of review.  We conclude that the proper standard of review here is the one we have consistently employed for State constitutional claims based on the free exercise of religion.  See Magazu, 473 Mass. at 441-445; Ahmad v. Department of Correction, 446 Mass. 479, 485 (2006); Rasheed, 446 Mass. at 466-467, 472-475; Society of Jesus, 441 Mass. at 669-673; Curtis v. School Comm. of Falmouth, 420 Mass. 749, 760 & n.10 (1995), cert. denied, 516 U.S. 1067 (1996); Desilets, 418 Mass. at 321-323.  As we conclude that the right is protected by the State Constitution, we need not address or resolve the Federal constitutional questions, including which standard of review would be applicable under the First Amendment free exercise claim here.  See Kligler v. Attorney Gen., 491 Mass. 38, 60, 62 (2022) (deciding due process question on State rather than Federal constitutional grounds because State Constitution may offer greater protection); Commonwealth v. Almonor, 482 Mass. 35, 42 n.9 (2019) ("as we conclude that a ping is a search under art. 14, we have no need to wade into these Fourth Amendment waters" [quotation and citation omitted]).[7]
      Under the standard of review for State constitutional free exercise claims, 
"the party claiming an unconstitutional burden on the free exercise of religion 'must show (1) a sincerely held religious belief, which (2) conflicts with, and thus is burdened by, the [S]tate requirement.  Once the claimant has made that showing, the burden shifts to the [S]tate. The [S]tate can prevail only by demonstrating both that (3) the requirement pursues an unusually important governmental goal, and that (4) an exemption would substantially hinder the fulfillment of the goal.'"
Magazu, 473 Mass. at 443, quoting Desilets, 418 Mass. at 322-323.  "[T]he State's assertion of a compelling interest, and the balancing of that interest against the burden imposed on the exercise of religion, is considered in a concrete, pragmatic, and fact-specific way."  Society of Jesus, 441 Mass. at 671.  It also requires narrow tailoring and is more protective than the Supreme Court's Smith test.  See Desilets, supra at 321 n.4. 
      iii.  Analysis.  Having articulated the proper test to apply when parents raise religious objections to routine medical care, we now apply this test to the facts before us. 
      First, the parents must show that their religious beliefs are sincerely held.  See Magazu, 473 Mass. at 443.  Although the judge took note of "the parents' inconsistencies in their statements regarding vaccination," he ultimately "assum[ed] arguendo that [the] parents are asserting a valid religious belief."  In evaluating the sincerity of those beliefs, we are respectful and reluctant, as was the judge, to conclude that such decision-making is insincere based on arguably inconsistent distinctions drawn by the parents, according to their understanding of their own religion's requirements.  See Desilets, 418 Mass. at 323 ("Supreme Court free exercise of religion cases have accepted, either implicitly or without searching inquiry, claimants' assertions regarding what they sincerely believe to be the exercise of their religion, even when the conduct in dispute is not commonly viewed as a religious ritual").  Cf. Sagar v. Sagar, 57 Mass. App. Ct. 71, 74 (2003) ("We need not, and should not, predicate a decision implicating a parent's free exercise right and his fundamental liberty interest in child rearing upon the tenuous ground that the parents' underlying religious belief is not 'sincerely held' because the motivation is not 'purely religious'").  We therefore conclude that the parents have established that they are asserting sincerely held religious beliefs.
      Second, the parents must show that the department's conduct "substantially burdens the [parents'] exercise of their religion."  Desilets, 418 Mass. at 324.  Here, we conclude that the parents have made the requisite showing.  The free exercise of religion comprises the right of parents to direct the religious upbringing of their children.  See McCauley, 409 Mass. at 137 ("The right to the free exercise of religion, including the interests of parents in the religious upbringing of their children is, of course, a fundamental right protected by the Constitution").  Because we conclude, supra, that the parents have not lost the right to direct their child's religious upbringing when they have temporarily lost custody, it follows that the parents' free exercise of religion under art. 46, § 1, is burdened by the department's decision to vaccinate their child over their religious objections.  We also conclude that such a burden is substantial.  To be substantial, such a burden must be more than a perceived or hypothetical one.  "It must have a tendency to coerce an individual into acting 'contrary to [his] religious beliefs.'"  Rasheed, 446 Mass. at 473, quoting Desilets, supra.  We conclude that the parents have shown that this standard is met here.  The parents have explained that they find vaccination contrary to their religious beliefs because, in the words of the father, "you're not supposed to put anything inside your body outside of what nature has already given you because it goes against God's plan."  Contrast Rasheed, supra ("there is no evidence that Rasheed cannot be clean shaven but for the use of Gold Magic shaving powder, or that he cannot wash himself in his cell before prayer without the foot pan, or that he cannot pray within the times proscribed by his faith"). 
      Third, the department must demonstrate "an important governmental interest that is sufficiently compelling" to justify the burden on the parents' religious exercise.  Desilets, 418 Mass. at 325.  See id. at 330.  The department argues that "[i]t is well established that 'protecting the well-being of children' qualifies as a compelling state interest."  See McCauley, 409 Mass. at 137.  See also Prince, 321 U.S. at 168; Blixt v. Blixt, 437 Mass. 649, 656 (2002), cert. denied, 537 U.S. 1189 (2003).  This is, of course, true as a general proposition.  "Acting to guard the general interest in youth's well[-]being, the state as parens patriae may restrict the parent's control . . ."  Prince, supra at 166.  See McCauley, supra at 138 ("the State has an interest in protecting the welfare of children within its borders").  We cannot, however, just rely on "broadly formulated interests."  Fulton v. Philadelphia, 593 U.S. 522, 541 (2021), quoting Gonzales v. O Centro Espírita Beneficente União do Vegetal, 546 U.S. 418, 431 (2006).  In analyzing both the compelling government interest at stake and whether exemptions may be allowed consistent with the policy, we must consider the specifics of the policy and its application.  Society of Jesus, 441 Mass. at 671 ("the State's assertion of a compelling interest, and the balancing of that interest against the burden imposed on the exercise of religion, is considered in a concrete, pragmatic, and fact-specific way").
      Specifically at issue here is the vaccination of children at the direction of the department.  As explained in the treating physicians' affidavit, a standard platform of vaccines for infants and children in the United States is recommended by the American Academy of Pediatrics and the Centers for Disease Control and Prevention, and failure to administer vaccines on the recommended schedule exposes infants and children to a risk of life-threatening preventable illnesses that can cause severe disease or death.  Requiring the recommended childhood vaccinations to achieve these health benefits and to avoid these health risks would, therefore, generally satisfy the compelling interest requirement. 
      Nonetheless, as the Supreme Court has stated in its own free exercise analysis, "a law cannot be regarded as protecting an interest 'of the highest order' . . . when it leaves appreciable damage to that supposedly vital interest unprohibited" (citation omitted).  Church of the Lukumi Babalu Aye, Inc., 508 U.S. at 547.  Here, we recognize that questions have been raised in this regard given the religious exemptions allowed by the Commonwealth and the inconsistent application of the childhood vaccination protocol by the department.  We conclude, however, that these exemptions and inconsistencies are most applicable to, and best addressed in, the final prong of the inquiry -- that is, whether an "exemption would substantially hinder the fulfillment of the goal," rather than whether the goal itself is compelling, as we conclude that the health benefits associated with, and risks minimized by, vaccination establish a compelling government interest.  Magazu, 473 Mass. at 443, quoting Desilets, 418 Mass. at 323.
      It is in this fourth and final prong that the department falls short.  Significantly, the Commonwealth itself provides exemptions from mandatory school vaccinations for children of parents with religious objections who retain custody.  See G. L. c. 76, § 15; 105 Code Mass. Regs. § 220.500(C); 105 Code Mass. Regs. § 430.153(A).  Additionally, the record does not in any way establish that the department consistently requires the vaccination of children in its care.  As explained supra, the child's own siblings in the custody of the department have not been vaccinated.  More specifically, there is nothing in the record explaining why the department elected not to vaccinate the child's siblings but insists that vaccinating this child is necessary.  These exemptions and inconsistencies undermine the department's contention that allowing this child to remain unvaccinated would substantially hinder the achievement of the health benefits provided by uniform vaccination administration.  See Dalli v. Board of Educ., 358 Mass. 753, 760 (1971) (describing previous iteration of statutory exemption from vaccinations as "an appropriate mark of deference to the sincere religious beliefs of the few which at the same time created a minimal hazard to the health of the many").  Given the exemptions already allowed by the Commonwealth and the inconsistent application of the vaccination requirement by the department here, we cannot conclude that allowing this child to remain unvaccinated would substantially hinder the department's interests.
      The department nonetheless argues that because the child is in foster care, this "increases her chances of exposure with other children," such that exempting her from vaccinations "would substantially hinder the State's interest in keeping all children in its borders safe."  This argument regarding foster care is unavailing.  First, the child is in a kinship placement, and nothing in the record indicates that she is likely to be transferred to another placement where she might have increased exposure to other children.  Her siblings, including one that was placed in the department's custody when he was eleven months old, younger than the child is now, have never been vaccinated, although they are also in foster care in a kinship placement.  That the department has allowed her siblings -- who are in similar circumstances but also attend school –- to remain unvaccinated further undercuts the department's position that granting an exemption to the child is not tenable.[8]  Finally, general statements about the exposure risk of children in foster care are insufficient alone to demonstrate that allowing this specific child to remain unvaccinated would "unduly hinder" the department's compelling interests.  
      In sum, the department has not provided adequate justification for why an exemption "would substantially hinder the fulfillment of" the department's goals if applied to this specific child in her specific circumstances.  Magazu, 473 Mass. at 443, quoting Desilets, 418 Mass. at 323.
      3.  Conclusion.  Parents who have temporarily lost custody of their child retain a constitutional right to direct the religious upbringing of the child.  When they object to vaccinations of their child on religious grounds, the department must demonstrate that allowing that child to remain unvaccinated would substantially hinder the department's compelling interest in the vaccinations.  As the Commonwealth allows religious exemptions from vaccination for parents who have not lost temporary custody of their children and the department has not demonstrated a consistent application of the vaccination requirement for children within its custody, even as between this child and her siblings, the department has not demonstrated that leaving this child unvaccinated would substantially hinder the department's compelling interests.  Accordingly, we reverse the order of the judge allowing the joint motion by the department and the child to facilitate the vaccination of the child.  
                        
So ordered.
footnotes

      [1] A pseudonym.
          [2] We acknowledge the amicus brief submitted by Massachusetts Family Institute, Inc.
               [3] The parties later learned that the child had received a vaccination against respiratory syncytial virus (RSV) on January 5, purportedly before the parents' motion to stay was filed.  Per hospital policy, the vaccination was mandatory for the child to be moved to the pediatrics floor of the hospital.
          [4] In this context, the rights protected by the free exercise and due process clauses appear to interact and overlap.  See e.g., Parker v. Hurley, 514 F.3d 87, 99 (1st Cir.), cert. denied, 555 U.S. 815 (2008) ("the Court [in Wisconsin v. Yoder, 406 U.S. 205 (1972),] did not analyze separately the due process and free exercise interests of the parent-plaintiffs, but rather considered the two claims interdependently, given that those two sets of interests inform one other").  
          [5] Title 110 Code Mass. Regs. § 7.104(1)(e) (2009) likewise requires foster parents to "respect and make efforts to support the integrity of a child's . . . religious background," suggesting, again, that the religious upbringing cultivated by the child's parents is entitled to respect, notwithstanding a temporary loss of custody.
               [6] We note, as did the single justice of the Appeals Court, that we are not presented with a case in which a child has herself expressed her own interests contrary to the parents.  Rather, the child was one month old at the time of the proceedings and her appointed counsel, using substituted judgment, presented legal arguments tracking the department's in regard to the importance of vaccination.  See Care & Protection of Georgette, 439 Mass. 28, 45-46 (2003) (when child is "incapable of verbalizing a preference, or incapable of making an adequately considered decision," child's counsel may substitute judgment for child [quotations and citation omitted]).  The child's counsel also argued before the judge that the parents' religious beliefs were not sincerely held and that the foster parent favored vaccination.  Counsel did not, and could not, directly express the views of the child given the child's age.  Therefore, this case is similar to Yoder, because it does not require us to "determine[] the proper resolution of possible competing interests of parents, children, and the State in an appropriate state court proceeding in which the power of the State is asserted on the theory that [the] parents are preventing their minor children from attending high school [in Yoder or vaccination in this case] despite their expressed desires to the contrary."  Yoder, 406 U.S. at 231.  See Sagar v. Sagar, 57 Mass. App. Ct. 71, 72, cert. denied, 540 U.S. 874 (2003) (once child is "of sufficient age to make the determination herself," her religious preferences are to be considered).  As the Supreme Court further explained in Yoder, "[r]ecognition of the claim of the State in such a proceeding would, of course, call into question traditional concepts of parental control over the religious upbringing . . . of their minor children recognized in this Court's past decisions."  Yoder, supra.
               [7] In applying our State constitutional test and concluding that it protects the free exercise rights at issue, we need not decide whether the department's vaccination policy is neutral and of general applicability and thus subject to the Smith test or whether, as the amicus here contends, by allowing some children to remain unvaccinated, the department undermined the general applicability of the rule and subjected itself to strict scrutiny.  See Smith, 494 U.S. at 878.  We apply the stricter standard here, as we do in all circumstances where State action burdens free exercise.  See Desilets, 418 Mass. at 321 & n.4.  As this case presents a State constitutional free exercise claim, we also reject application of the more open-ended best interests of the child standard advocated by the department as such a standard gives insufficient weight to the constitutional rights of the parents.
          [8] The argument is all the more peculiar for the department's emphasis that the child spends time with her unvaccinated siblings.  The department points to her visits with her unvaccinated siblings to argue that she has "the potential for exponentially greater exposure to people and places throughout the Commonwealth than an individual residing with his or her parents."  Put differently, the department seems to rely on its decision not to vaccinate her siblings in support of its argument that allowing this child to remain unvaccinated would be impracticable and dangerous.